UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

Joseph T. Carmack )
)
Petitioner, Pro Se )        PETITION FOR REVIEW
)        UNDER SECTION 3 (FIRST)
v.                          )        OF RAILWAY LABOR ACT
)
NATIONAL MEDIATION BOARD    )
SPECIAL BOARD OF ADJUSTMENT )
NO. 928                     )
)
Respondent )

RECEIPT # 61724
AMOUNT $ 150.00
SUMMONS ISSUED 3
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. M.P.
DATE 1/31/05

PETITION FOR REVIEW UNDER SECTION 3 (FIRST) OF RAILWAY LABOR ACT

1. Joseph T. Carmack, petitioner, pro se, files this petition to review and set aside

an order of the National Mediation Board, Special Board of Adjustment No. 928, here

referred to as the Board, being its award No. 382 Dated January 31, 2003 and rendered

on April 21, 2003 in case no. 382.

MAGISTRATE JUDGE MBB

2. Jurisdiction of the present action is conferred on the court by the provisions of

Section 3 First (q), here referred to as the Act; and by 28 USCA s,. 1337, relating to any

civil action or proceeding arising under any Act of Congress regulating commerce.

3. The parties to the proceeding before the Board resulting in its order and award

were petitioner's representative Rail Labor Organization, The Brotherhood of Locomotive

Engineers (BLE) which is now referred to as The Brotherhood of Locomotive Engineers

and Trainmen (BLET) and respondent railroad, the National Railroad Passenger

Corporation (Amtrak); however, as alleged, the Board's order and award involved the

claims of petitioner, an employee of respondent railroad, represented by his labor

organization and the present action is brought by petitioner on his own behalf.

1

4.  At all times relevant to this petition petitioner was an employee of respondent railroad as defined in Section 1 First of the Act (45 USCA s,. 151 Sixth), respondent railroad was and now is, a carrier as defined in Section 1 First of the Act (45 USCA s,. 151 First). Likewise, petitioner's labor organization, the Brotherhood of Locomotive Engineers (BLE) was and the Brotherhood of Locomotive Engineers and Trainmen (BLET) now is the authorized and designated representative of respondent petitioner and respondent's employees in the Locomotive Engineer craft, as defined in Section 1 Sixth of the Act (45 USCA s,. 151 Sixth).

5.  The Plaintiff, Joseph Thomas Carmack, is a natural person residing at 592 Tremont Street, Boston, County of Suffolk Massachusetts.

6.  The Plaintiff, Joseph Thomas Carmack, uses a mailing address of 398 Columbus Avenue, Private Mail Box 130, Boston, County of Suffolk Massachusetts.

7.  The respondent railroad, the National Railroad Passenger Corporation ("NRPC", hereinafter also referred to as "Amtrak") is a for profit corporation and quasi-governmental entity organized and existing under the laws of the United States and the Commonwealths of Massachusetts and Pennsylvania. The Defendant's corporate headquarters is located at 60 Massachusetts Avenue, NE Washington, DC. The NRPC also maintains offices at Two South Station in Boston, Massachusetts and 30th Street Station, Philadelphia Pennsylvania.

8.  This court has personal jurisdiction over the Defendant who resides within this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred in this district. Venue is proper in this district under 28 U.S.C. s 1391 (b) and 1391 (c).

10. This court has supplemental jurisdiction over ancillary claims that are so related to claims in this action, of which this court has original jurisdiction, that such ancillary claims form part of the same case or controversy under 28 U.S.C. s. 1367.

2

11. In addition to subject matter jurisdiction under the Railway Labor Act as mentioned in paragraph 2, this court has subject matter jurisdiction over this matter pursuant of 42 U.S.C. s. 1983, 29 U.S.C. s. 141 et seq (including s. 143), 29 U.S.C. 151 et seq., 1 U.S.C., 4 U.S.C., 5 U.S.C. s. 552 (a) and 6 U.S.C.

12. On October 26, 1982, petitioner's representative, BLE, as representative of respondent railroad's employees in the above-mentioned craft, entered into an agreement (here referred to as the Collective Bargaining Agreement, CBA or Amtrak/BLE agreement) including subsequent amendments with respondent railroad, governing rules, rates of pay, hours of service, and working conditions of respondents' railroad's employees, including petitioner.

13. The work rules of the Collective Bargaining Agreement include pertinent rules covering Discipline and Investigation (Rule 21), Medical Leave of Absence (Rule 22 paragraph k) and medical disqualification (Rule 25) and are set forth in Exhibit A, attached and made a part of this petition.

14. This petition is filed pursuant to 45 U.S.C. s. 153 paragraph (q) in that the petitioner is aggrieved by the Board's failure to make its Award No. 382 under the terms of the CBA; the petitioner is aggrieved by the terms of the award pursuant to United States Constitution provisions referred to above; and the Board failed to include certain terms in its award including the right to join, organize, or assist in organizing the labor organization of petitioner's choice free from interference by the carrier (45 U.S.C 152 Fourth) and the right to quit work in the good faith belief in the abnormally dangerous conditions of such work (29 U.S.C. s. 143).

I. Facts of Claim on which Award No. 382 is based

15. As an active member of the representative organization, the petitioner was highly expressive of opinions and matters of union business that (as with other members of the organization) often resulted in differences with the organization's Local Chairman (Organization's Brief at page 21 Exhibit B).

3

16. On March 11, 2001, the Local Chairman published a document critical of petitioner and distributed within representative organization (Exhibit C).

17. On April 4, 2001, petitioner issued a response to the Local Chairman including supportive organization and carrier documents that was framed in a serious religious allegory and mocking satirical parody entitled Letters from Hell (Exhibit D)..

18. The religious allegorical element of Letters from Hell is in the form of two fictional letters imagined to have been written by "Lucifer, Prince of Darkness" to 'God'.

19. The first letter, which opens the compilation, says "Dear God, I hear a fat lady singing. Very, very **truthfully** yours, Lucifer Prince of Darkness" (Emphasis in original).

20. This first letter refers back to an earlier religiously allegorical letter that had been distributed seven months earlier and was "strewn about the [carrier's] commuter service property for months prior to any carrier action being undertaken" (Organizations Brief at page 21, Exhibit B).

21. The second religiously allegorical letter from 'Lucifer' to 'God' includes reference to an imaginary play based on Shakespeare's Hamlet wherein 'Lucifer' uses carrier's commuter service as a setting in place of Shakespeare's Denmark.

22. The back page of the second 'Letter' to God includes quotations from Shakespeare's and a reference to the play Rosencrantz and Guildenstern are Dead! by the contemporary English playwright Tom Stoppard.

23. The organization document entitled Letters from Hell includes a political cartoon depicting a photograph of Godzilla copied from local newspaper and references a fictional organization called the "Institute of Devastation Awareness".

24. On April 11, 2001, the carrier's Road Foreman, who was the petitioner's immediate supervisor, complained to the carrier's Director of Operations that petitioner's creative documents should be interpreted as a threat to the Road Foreman's person.

4

25. Carrier's Director of Operations did not agree that the documents constituted a threat and suggested that the Road Foreman complaint to carrier's Threat Assessment and Response Team (TART) (hearing transcript pages 197-199, Exhibit E)..

26. Later that same day, April 11, 2001, carrier Road Foreman complain to carrier Director of Labor Relations in turn reported the Road Foreman's complaint to carriers Medical Director and faxed the aforementioned satirical and allegorical documents to said Medical Director.

27. Three weeks later, on May 3, 2001, having had no response from the Medical Director, carrier Human Resources manager copied an e-mail to carrier's Manager of Health Services which requested that the Medical Director order a "(Psychiatric) evaluation" (Exhibits F and G).

28. At the behest of the Labor Relations Director's request, the Medical Director declared that petitioner should be medically disqualified under the presumption that petitioner was suffering from a "severe psychiatric disorder...such things as personality disorder, bi-polar disorder, etc." (Transcript of hearing and memo Exhibits H and I).

29. On May 4, 2001, carrier's Director of Operations medically disqualified petitioner based on the Medical Director's assertions.

30. On June 8, 2001, carrier's Director of Operations directed petitioner to undergo a psychiatric fitness for duty exam with a Boston Doctor. The doctor is Board certified in psychiatry and neurology.

31. On June 27, 2001, petitioner reported to the psychiatrist for examination with organization's Local Chairman, requested medical records necessitating the exam and expressed misgivings concerning the requirement to undergo the exam (hearing transcript excerpts Exhibit J).

32. At said meeting with the psychiatrist, the psychiatrist refused to perform the exam and stated to petitioner and Local Chairman that he would call carrier and suggest that another course of action might be found (Exhibit J).

33. On June 27, 2001, the Local Chairman reported to the Director of Operations that the psychiatrist declined to perform an evaluation on petitioner and further reported that the psychiatrist would suggest and alternate course of action to carrier's medical department.

34. On July 16, 2001 the psychiatrist wrote a letter to carrier contradicting his statement to petitioner and Local Chairman by writing that petitioner declined to submit to examination. Petitioner was not informed of the psychiatrists letter nor its contents (Exhibit K).

35. On July 24, 2001, the Director of operations ordered the petitioner to again schedule a psychiatric evaluation with the same Boston psychiatrist.

36. Having consulted with his own doctor concerning medical concerns created by the forced non-confidential nature of the exam, petitioner expressed the same concerns to the Boston psychiatrist assigned to perform evaluation to be reported to carrier (Exhibit L)..

37. Petitioner stated to the carrier's psychiatrist that petitioner would have to submit to an evaluation in spite of medical concerns because petitioner wanted to avoid losing his job.

38. On or about August 22, 2001, and in various previous phone conversations, carrier's psychiatrist stated to petitioner that the psychiatrist did not wish to proceed with any evaluation and that the psychiatrist would tell carrier to "get another doctor" (Exhibit M).

39. On or about August 28, 2001, carrier's psychiatrist again contradicted his statement to petitioner and wrote a letter to carrier stating that petitioner "declined to present" for psychiatric evaluation (Exhibit N).

40. On September 10, 2001, carrier initiated charges of "gross insubordination" against petitioner.

41. After postponing original hearing scheduled for September 17, 2001, carrier and organization completed four days of investigation on May 7, 2002 and carrier terminated petitioner from employment with carrier on May 13, 2002.

42. Organization initiated appeal process on May 29, 2002.

43. Highest representative designated to hear such appeals denied claim on August 28, 2002.

44. Petitioner's claim was submitted to Special Board of Adjustment No. 928 on September 5, 2002 and the Board heard the case as case No 382 on September 23, 2002 (Award No. 382, Exhibit O)..

44. The Board neutral submitted his denial Dated at Chicago, Illinois, January 31, 2003 and the Board rendered the Award No. 382 on April 21, 2003.

II. Failure of Award No. 382 to Comply with requirements of the Act.

CBA Rule 21 k.4

45. Rule 21 of the Collective Bargaining Agreement paragraph k.4, reads as follows:

> The decision of the highest appeals officer of the Corporation will be final and binding unless, within 30 days after the date the General Chairman receives the decision, the General Chairman notifies the highest appeals officer of the Corporation in writing of his desire to submit the case to the Special Board of Adjustment. After the highest appeals officer of the Corporation receives such notification, the Board will be convened as promptly as possible. The Board will render a final and binding decision as promptly as possible, but not later than 30 days after the case is presented before the Board.

46. Pursuant to 45 U.S.C s. 153 First (q), Award No. 382 failed to comply with the requirements of the act in that the Board was convened on September 23, 2002 but rendered its decision on April 21, 2003 which is later than 30 days after the case is

7

presented before the Board and in violation of Rule 21 k.4 of the Collective Bargaining Agreement.

III. Failure of Award No. 382 to Comply with requirements of the Act.

CBA Rule 25 b.

47. Rule 25 of the Collective Bargaining Agreement paragraph b, reads, in pertinent part, as follows:

> When it is obvious that a Passenger Engineer is medically (physically or mentally) impaired in a way that affects his service, the Corporation may hold that Passenger Engineer out of service pending the outcome of a medical examination.

48. Petitioner was medically disqualified by the carrier physician at the mere prompting and request of carrier's Manager of Labor Relations and not because of any 'obvious' impairment.

49. Carrier physician's assertion of underlying indications of "severe psychiatric disorder" in petitioner's creative machinations is utterly arbitrary, capricious, medically baseless and without foundation in reason or fact.

50. Pursuant to 45 U.S.C s. 153 First (q), Award No. 382 failed to comply with the requirements of the act in that the Award was based on an assessment of a mental impairment in Violation of CBA Rule 25 where no such mental impairment was obvious.

IV. Failure of Award No. 382 to Comply with requirements of the Act.

CBA Rule 22 k.

51. Rule 22 of the Collective Bargaining Agreement paragraph k, reads as follows:

> A leave of absence is not required when a Passenger Engineer is unable to perform service for the Corporation due to a bona fide sickness or injury.

52. Carrier communicated to petitioner and petitioner's representative Rail Labor Organization that petitioner was on a Medical Leave of Absence (MLA) and petitioner

was absent from duty due to a bona fide sickness ("severe psychiatric disorder..such things as personality disorder, bi-polar disorder. etc.") (Exhibit **H**).

53. Being absent due to a bona fide illness petitioner was free from carrier's administrative control with leave to address his presumed illness with his own personal physician and free from carrier's administrative control.

54. Pursuant to 45 U.S.C s. 153 First (q), Award No. 382 failed to comply with the requirements of the act in that the Award failed to recognize petitioner's Medical Leave of Absence and was not based on a "full statement of the facts and all supporting data bearing upon the dispute" (45 U.S.C. s. 153 (i)).

V.  Failure of Award No. 382 to comply with the Requirements of the Act
in that it failed to consider entire Decision Letter of Hearing Officer

55. Carrier failed to submit petitioner and his representative Rail Labor Organization Page 6 of Hearing Officer's 'Decision Letter' from investigation on which Award No 382 was based and which petitioner's representative Rail Labor Organization submitted to neutral Board member as 'Employee Exhibit "C"' in organization Brief.

56. Pursuant to 45 U.S.C s. 153 First (q), Award No. 382 failed to comply with the requirements of the act in that the Award was not based on the entire decision letter and therefore Award No 382 was not based on a "full statement of the facts and all supporting data bearing upon the dispute" (45 U.S.C. s. 153 (i))(Exhibit **P**, Missing Page),

VI.  Failure to Comply with the Requirements of the Act in that Award No. 382
Interferes with petitioner's right to join, organize, or assist in organizing the labor
organization of petitioner's choice

57. Petitioner was medically disqualified and ultimately terminated for using creative literary techniques designed to heighten the ethical, moral and religious value of a political discussion within the inner workings of petitioner's representative Rail Labor Organization which said expression is outside the purview of carrier interference (45 U.S.C. s. 152 Fourth.

58. Pursuant to 45 U.S.C s. 153 First (q), Award No. 382 failed to comply with the requirements of the act in that the Award interferes with the organization and right of petitioner to assist in organizing petitioner's representative Rail Labor Organization.

VII. Failure of the Award No. 382 to conform or confine itself to matters within the scope of the Board's jurisdiction: 1 U.S.C. Speech Expression

59. Petitioner was medically disqualified and ultimately terminated for using creative literary techniques designed to heighten the ethical, moral and religious value of a political discussion within the inner workings of petitioner's representative Rail Labor Organization which said expression is protected by the United States Constitution 1 U.S.C.

60. Petitioner was accused of insubordination and ultimately terminated for expressing his own medical concerns to carrier's psychiatrist which said expression is speech protected by the United States Constitution 1 U.S.C.

VIII. Failure of the Award No. 382 to conform or confine itself to matters within the scope of the Board's jurisdiction: 4. U.S.C. Search and Seizure

61. Petitioner was Charged with Gross Insubordination and ultimately terminated for allegedly refusing to undergo a complete psychiatric evaluation including psychological testing that would reveal deeply personal and private information of which not even petitioner himself is entirely aware and said revelation would violate the security of his person (4. U.S.C.) and is otherwise outside the scope of any assessment of petitioners ability to perform service for carrier.

IX. Failure of the Award No. 382 to conform or confine itself to matters within the scope of the Board's jurisdiction: 5 U.S.C s. 552a

62. Award No. 382 sanctions release of personal private medical information to carrier staff including Medical Director's assertions of "severe psychiatric disorder". (5 U.S.C. s. 552a).

X. Failure of the Award No. 382 to conform or confine itself to matters within the
Board's jurisdiction (29 U.S.C s. 143).

63. Hearing officer credited petitioner's good faith belief that order to comply
with psychiatric evaluation would be medically harmful and therefore abnormally
dangerous and such refusal is protected by carrier policy and the United States
Constitution (Decision Letter and 29 U.S.C. s. 143).

XI. Failure of the Award No. 382 to conform or confine itself to matters within the
Board's jurisdiction in denying right of petitioner to confront his accuser.

64. Carrier's charge of insubordination was based on written assertions of carrier's
psychiatrist stating that petitioner refused to submit to psychiatric evaluation.

65. Carrier's psychiatrist refused to present for insubordination investigation
Exhibit Q.

66. In spite of absence of carrier's psychiatrist, carrier's hearing officer accepted
written testimony of psychiatrist on which carrier based its charge of insubordination.

67. Carrier and Board award applied carrier's written accusations as evidence but
denied petitioner's personal physicians written notice that order to submit to psychiatric
evaluation would be medically harmful.

68. Whereas, principle evidence accusing petitioner with insubordination was
supplied by a witness who was not present at investigation, Award No. 382 is based on
accusation by a witness that petitioner was denied the right to confront in violation of
Amendment VI of the Constitution of the United States, 6 U.S.C.

XII. Fraud by member of division making the order.

69. Carrier Board member communicated to petitioner and petitioner's
representative Rail Labor Organization that carrier considered petitioner on medical leave
due to a Medical Leave of Absence. ( Exhibit R )

70. In spite of the fact that he considered petitioner incapable of complying with
order due to a bona fide illness in accordance with Rule 22 k of the CBA, carrier Board

fraudulently considered petitioner under carrier's administrative control and fraudulently considered petitioner insubordinate.

XIII. Failure of Award No. 382 to comply with the Requirements of the Act:

Carrier claim of insubordation not timely.

71. Collective Bargaining Agreement reads, in pertinent part:

A Passenger Engineer directed to attend a formal investigation to determine his responsibility, if any, in connection with an act or occurrence will be notified in writing within seven days from the date of the act or occurrence or in cases involving stealing or criminal offense within seven days from the date the Carrier becomes aware of such act or occurrence.

72. By letter dated August 28, 2001, carrier psychiatrist reported that petitioner "declined to present" to an evaluation session psychiatrist had scheduled for August 27, 2001.

73. Petitioner had not understood that carrier psychiatrist was to make such a report, but instead had expected that psychiatrist had reported that psychiatrist, himself had declined to perform the examination.

74. Carrier based its charge of insubordination on psychiatrists claim of occurrence of August 27, 2001.

75. Carrier charged petitioner with insubordination on September 10, 2001.

76. Award No. 382 claims that petitioner was defiant, when actually petitioner claims a comminication conflict between petitioner and psychiatrist and the resulting inability of petitioner to confront his accuser.

77. Carrier failed to notify petitioner of charge of insubordination in time requred by Rule 21,d.1 of CBA.

77. Had CBA Rule 21.3.1 been complied with, petitioner would have been free of any need to confront any accuser because no accusation could have been made.

WHEREFORE, petitioner respectfully requests that this honorable court review and set aside Award No. 382 of Special Board of Adjustment 928 on the grounds stated herein.

Dated: January 31, 2005

Joseph T. Carmack, Petitioner, Pro Se
398 Columbus Ave, PMB 130
Boston, MA  02116-6008
Phone:  617/536-0772
         617/ 727-2310 ext 7045
Beeper w/voice mail:  617/798-6466

Exhibit __A__

notification, the claim will become invalid unless, within one year from the date of the Corporation's decision, the claims are disposed of on the property or submitted to a tribunal having jurisdiction pursuant to law or agreement, unless the parties mutually agree to other proceedings for final disposition of said claims.

i. The time limit provisions in this Rule may be extended at any level of handling in any particular case by mutual consent of the duly authorized officer of the Corporation or representative of the Organization.

j. The time limits set forth herein do not apply in discipline cases.

## RULE 21

### DISCIPLINE AND INVESTIGATION

a. Except as provided in paragraph "c," no Passenger Engineer will be disciplined, suspended or dismissed from the service until a fair and impartial formal investigation has been conducted by an authorized Corporation officer.

b. 1. Except when a serious act or occurrence is involved, a Passenger Engineer will not be held out of service in disciplinary matters before a formal investigation is conducted. A serious act or occurrence is defined as: <u>Rule "G," Insubordination, Extreme Negligence, Stealing</u>.

2.  If a Passenger Engineer is held out of service before a formal investigation for other than a serious act or occurrence, he will be paid what he would have earned on his assignment had he not been held out of service beginning with the day he is taken out of service and ending with the date the decision is rendered or he is returned to service, excluding the day of the formal investigation, whether or not he is disciplined. Holding a Passenger Engineer out of service before a formal investigation or paying him for being out of service for less than a serious act or occurrence is not prejudging him.

c.  Formal investigations, except those involving a serious act or occurrence, may be dispensed with should the Passenger Engineer involved and/or the duly accredited representative and an authorized officer of the Corporation, through informal handling, be able to resolve the matter to their mutual interests. Requests for informal handling must be made at least 24 hours before a formal investigation is schedule to begin.  No formal transcript, statement or recording will be taken at the informal handling.  When a case is handled informally and the matter of responsibility and discipline to be assessed, if any, is resolved, no formal investigation will be

required.  A written notice of the discipline assessed and
the reason therefor will be issued to the Passenger
Engineer responsible, with a copy to the duly accredited
representative if he participated in the informal handling,
at the conclusion of the informal handling.  Discipline
matters resolved in accordance with this paragraph are
final and binding.

     d.  1.  A Passenger Engineer directed to attend a
formal investigation to determine his responsibility, if
any, in connection with an act or occurrence will be
notified in writing within seven days from the date of the
act or occurrence or in cases involving stealing or
criminal offense within seven days from the date the
Corporation becomes aware of such act or occurrence.  The
notice will contain:

     A.  The time, date and location where the
         formal investigation will be held.

     B.  The date, approximate time and the
         location of the act or occurrence.

     C.  A description of the act or occurrence
         which is the subject of the investigation
         and rules which may be involved.

     D.  A statement that he may be represented
         by his duly accredited representative.

E.  The identity of witnesses directed by the Corporation to attend.

2.  When a letter of complaint against a Passenger Engineer is the basis for requiring him to attend the formal investigation, the Passenger Engineer will be furnished a copy of the written complaint together with the written notice for him to attend the investigation.

e.  1.  The investigation must be scheduled to begin within seven days from the date the Passenger Engineer received notice of the investigation.

2.  A Passenger Engineer who may be subject to discipline will have the right to have present desired witnesses who have knowledge of the act or occurrence, to present testimony, and the Corporation will order employee witnesses to be in attendance.

3.  The time limit is subject to the availability of the principal(s) involved and witness(es) to attend the formal investigation and may, by written notice to the Passenger Engineer involved, be extended by the equivalent amount of time the principal(s) involved or necessary witness(es) are off duty due to sickness, temporary disability, discipline, leave of absence or vacation.

- 33 -

When a Passenger Engineer is being held out of service for a serious act or occurrence pending the investigation and other principal(s) or witness(es) are not available for the reasons cited, he may request commencement of the investigation. If either the Passenger Engineer or the Corporation officer is of the opinion that the testimony of the unavailable principal(s) or witness(es) is necessary for the final determination of the facts and discipline has been assessed against the Passenger Engineer as a result of the investigation, such discipline will be reviewed when the testimony of the missing principal(s) or witness(es) is available.

4.   When a formal investigation is not scheduled to begin within the time limit as set forth in this Rule, no discipline will be assessed against the Passenger Engineer.

5.   A Passenger Engineer who may be subject to discipline and his duly accredited representative will have the right to be present during the entire investigation. Witnesses may be examined separately but those whose testimony conflicts will be brought together.

f.   When a Passenger Engineer is assessed discipline, a true copy of the investigation record will be given to the Passenger Engineer and to his duly accredited representative with the notice of discipline.

- 34 -

g.   1.   If discipline is to be imposed following a formal investigation, the Passenger Engineer to be disciplined will be given a written notice of the decision within 10 days of the date the formal investigation is completed, and at least 15 days prior to the date on which the discipline is to become effective, except that in cases involving serious acts or occurrences, discipline may be effective at any time.

2.   When a Passenger Engineer is required to perform service during a period of suspension, the balance of said suspension will be eliminated.

h.   1.   When a Passenger Engineer or his duly accredited representative considers the discipline imposed unjust and has appealed the case in writing to the Labor Relations officer having jurisdiction within 15 days of the date the Passenger Engineer is notified of the discipline, the Passenger Engineer will be given an appeal hearing. Dismissal cases involving claims for time lost will be handled in accordance with the provisions of paragraph "k."

2.   The hearing on an appeal, if requested, will be granted within 15 days of the Labor Relations officer's receipt of the request for an appeal hearing.

3.   Except when discipline assessed is dismissal, or when a Passenger Engineer has been held out

- 35 -

of service under paragraph "b" and assessed discipline, this appeal will act as a stay in imposing the discipline until after the Passenger Engineer has been given an appeal hearing.

4. At appeal hearings, a Passenger Engineer may, if he desires to be represented at such hearings, be accompanied by his duly accredited representative.

5. The Labor Relations officer having jurisdiction will advise the Passenger Engineer of the decision, in writing at the conclusion of the appeal hearing, with a copy to the duly accredited representative. If the decision is to the effect that the discipline will be imposed, either in whole or for a reduced period, the stay referred to in paragraph "h3" will be lifted, and the discipline will be effective on the day following the day of the appeal hearing.

i. If a decision rendered by the Labor Relations officer is to be appealed, the General Chairman must, within 60 days after the date the decision is rendered by the Labor Relations officer, make an appeal in writing to the highest appeals officer of the Corporation requesting either that he be given a written response or that the case be held in abeyance pending discussion in conference with the highest appeals officer of the Corporation. When a

- 36 -

written response is requested, the highest appeals officer of the Corporation will give written notification of his decision to the General Chairman within 60 days after the date of his receipt of the appeal. When a request is made for the case to be held in abeyance pending discussion in conference, the conference will be arranged within 60 days after the highest officer of the Corporation receives the request for a conference. The highest appeals officer of the Corporation will give written notification of his decision to the General Chairman within 60 days after the date of the conference.

     j.  The decision of the highest appeals officer of the Corporation will be final and binding unless, within 60 days after the date of the written decision, that officer is notified in writing that his decision is not accepted. In the event of such notification, the decision on a case involving other than dismissal is still final and binding, unless the case is submitted to a tribunal having jurisdiction pursuant to law within one year computed from the date the decision was rendered.

     k.  <u>Expedited Procedure for Handling Dismissal Cases</u>.

     1.  When a Passenger Engineer is dismissed, his case may be given expedited handling by his General

- 37 -

Chairman to a Special Board of Adjustment, which will meet
in Philadelphia, PA, and be composed of three members:

      A.  A representative of the Brotherhood of
          Locomotive Engineers.

      B.  The highest appeals officer of the
          Corporation or his designated repre-
          sentative.

      C.  A neutral member selected by the
          parties.

In the event the parties are unable to agree
upon a neutral member, they will request the National
Mediation Board to appoint a neutral. Such Special Board
will be established pursuant to Public Law 89-456 89th
Congress, H. R. 706 June 20, 1966, within 30 days of the
effective date of this Agreement.

2. Before invoking the services of the
Special Board of Adjustment, the General Chairman must,
within 30 days after the date of a notice of dismissal,
appeal the case in writing directly to the highest appeals
officer of the Corporation.

3. In the written appeal, the General
Chairman should either request a conference or waive the
conference and request a written decision. When a
conference is requested, a meeting date will be arranged as

- 38 -

promptly as possible but not later than 30 days after the
highest appeals officer of the Corporation receives the
request.  The highest appeals officer will render a
decision in writing to the General Chairman as promptly as
possible, but not later than 15 days after the date the
case is discussed in conference.  When a written decision
is requested, the highest appeals officer of the
Corporation will render a decision in writing to the
General Chairman as promptly as possible, but not later
than 30 days after the date the appeal is received.

    4.  The decision of the highest appeals
officer of the Corporation will be final and binding
unless, within 30 days after the date the General Chairman
receives the decision, the General Chairman notifies the
highest appeals officer of the Corporation in writing of
his desire to submit the case to the Special Board of
Adjustment.  After the highest appeals officer of the
Corporation receives such notification, the Board will be
convened as promptly as possible.  The Board will render a
final and binding decision as promptly as possible, but not
later than 30 days after the case is presented before the
Board.

    5.  Claim for time lost will be waived in any
dismissal case which the Organization does not progress

- 39 -

under the Expedited Procedure for Handling Dismissal
Cases. This will not preclude the Organization from
progressing such a case to a tribunal having jurisdiction
pursuant to law without regard to any time limits in this
Rule. The progression of such a case will not be
considered a request for leniency.

     1. 1. Time limits provided for in this Rule may
be extended or waived by agreement in writing between the
applicable officer of the Corporation and the Passenger
Engineer's General Chairman or duly accredited
representative.

     2. If discipline assessed is not appealed
within the time limits set forth in this Rule or as
extended, the decision will be considered final, except as
provided in paragraph "k5." If the decision on the appeal
is not rendered within the time limits set forth in this
Rule or as extended, the discipline assessed will be
expunged.

     m. When notification in writing is required,
personal delivery or proof of mailing within the specific
time limit will be considered proper notification.

- 40 -

## RULE 22

## LEAVE OF ABSENCE

a.  Passenger Engineers must request written leave of absence when they are to be off duty for more than 30 consecutive days.

b.  A written leave of absence without impairment of seniority will be granted upon request to a Passenger Engineer for the following reasons:

1.  To accept an official position with the Corporation or related national railroad agencies.

2.  To perform union committee work or to accept a full-time union position with Brotherhood of Locomotive Engineers.

3.  To accept an elective or appointive public office for which a competitive examination is not required.

4.  To accept an appointive public office for which a competitive examination is required, if such public office is related to railroad work.

c.  Upon request, a Passenger Engineer will be granted a written leave of absence to perform military service in accordance with current applicable reemployment statutes.

- 41 -

d.  A Passenger Engineer granted a leave of absence in accordance with paragraph "b1" or "2" will be granted that leave of absence for the duration of the assignment.

e.  A request for a leave of absence for reasons other than those outlined in paragraphs "b" and "c" may be granted upon agreement between the highest appeals officer of the Corporation and the General Chairman.

f.  A request for a leave of absence or for an extension must be made in writing to the highest appeals officer of the Corporation, with a copy to the General Chairman.

g.  Except as set forth in paragraphs "c" and "d," no leave of absence or extension thereof will exceed one year.

h.  A Passenger Engineer who fails to report for duty within 15 days after the expiration of an authorized leave of absence or an extension thereof or fails to furnish satisfactory reason for not doing so will have his seniority terminated and record closed.  A Passenger Engineer whose seniority has been terminated may, through the General Chairman, appeal such termination to the

- 12 -

highest appeals officer within 30 days of the notice of termination.

i.  A Passenger Engineer granted a leave of absence under paragraph "bl" or "2" will be required to return to duty in the craft within 60 days after being relieved of his assignment, or he will be subject to conditions set forth in paragraph "h."

j.  A Passenger Engineer who absents himself without a written authorized leave of absence, as provided in this Rule, will have his seniority terminated.

k.  A leave of absence is not required when a Passenger Engineer is unable to perform service for the Corporation due to a bona fide sickness or injury.

l.  A Passenger Engineer on an authorized leave of absence who engages in other employment not provided for in the authorized leave of absence will forfeit all his seniority.

## RULE 23

### COMPULSORY RETIREMENT

Retirement will be compulsory at the end of the month in which a Passenger Engineer reaches 70 years of age.

- 43 -

## RULE 24

### APPROVAL OF APPLICATION

a. Applications for employment will be rejected within 90 calendar days after seniority date is established, or applicant will be considered accepted. Applications rejected by the Corporation must be declined in writing to the applicant.

b. A Passenger Engineer who has been accepted for employment in accordance with paragraph "a" will not be terminated or disciplined by the Corporation for furnishing incorrect information in connection with an application for employment or for withholding information therefrom, unless the information involved was of such a nature that the Passenger Engineer would not have been hired if the Corporation had timely knowledge of it.

## RULE 25

### PHYSICAL REEXAMINATION

a. Passenger Engineers will be subject to periodic medical examination in accordance with Corporation policy.

b. When it is obvious that a Passenger Engineer is medically (physically or mentally) impaired in a way that affects his service, the Corporation may hold that Passenger Engineer out of service pending the outcome of a

- 41 -

medical examination. Passenger Engineers held out of service by the Corporation because they are medically unable to perform service may have an examination by a doctor of their own choosing without expense to the Corporation. In case of disagreement on the Passenger Engineer's fitness to work, the two doctors will select a third doctor, who is a specialist in the medical area involved, and the decision of the majority of the three as to the Passenger Engineer's fitness will be final. The expense of the third doctor will be shared equally by the parties. If it is determined that the Passenger Engineer's condition does not warrant being held out of service, such Passenger Engineer will be returned to service, and if it is determined that the Passenger Engineer was medically fit to perform service at the time he was held out of service, the Passenger Engineer will be paid for all time lost.

c. A Passenger Engineer who has accepted medical disqualification or who was found to be properly disqualified by a neutral physician may, if there has been a change in his medical condition as evidenced by a report of his personal physician, request a reexamination. There will be no claim for time lost in such case, unless the Corporation refuses to grant the reexamination or there is unreasonable delay in applying the terms of this paragraph.

- 25 -

Exhibit __B__

SPECIAL BOARD OF ADJUSTMENT NO. 928

ORGANIZATION'S BRIEF

RE: Case No. 382
Claimant — J. T. Carmack

| | |
|---|---|
| PARTIES) | BROTHERHOOD OF LOCOMOTIVE ENGINEERS |
| TO ) | vs |
| DISPUTE) | NATIONAL RAILROAD PASSENGER CORPORATION |

System Docket No. OC-BLE-SD-1418D

## I.  Organization's Statement Of Claim:

Claim of Amtrak Passenger Engineer J. T. Carmack for rescinding the discipline imposed of "DISMISSAL IN ALL CAPACITIES EFFECTIVE IMMEDIATELY" as stated in the decision letter of May 13, 2002, under the signature of Assistant General Manager, Commuter Operations, Francis J. O'Connor, Jr.  Said claim seeks restoration to service with full seniority and vacation rights unimpaired, full compensation for time lost, full credit toward vacation entitlement, health and welfare benefits during the period held out of work, and clearing of Claimant's personal record relative to the alleged violation.

### Outline of Alleged Offenses

On Friday, September 7, 2001, the Customer Service/Commuter Rail Transportation Office was contacted by Amtrak's Medical Director's Office, and informed that you failed to appear for an appointment with Dr. Vasile on August 27, 2001, at 4:00 P. M., a date and time negotiated and agreed by both of you.

CHARGE 1:  Development of the facts and determination of your responsibility, if any, in that on August 27, 2001, at 4:00 P. M., you failed to appear for a fitness for duty evaluation with Dr. Vasile.  In a letter dated July 24, 2001, you were instructed by Mr. O'Malley, Director of Operations, "that your failure to appear, your refusal to

cooperate with the physician, or adopt some other tactic to frustrate this evaluation would initiate the formal discipline process for gross insubordination."

Your alleged failure to comply with this directive constitutes a direct violation of Amtrak's 'Standard of Excellence', under the section titled *'Professional and Personal Conduct'*, specifically Teamwork, which reads in pertinent part:"[F]ollowing instructions...you must comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and mangers."

## I.  Preliminary Claimant Background

Claimant, J. T. Carmack, is a Boston, MA, based Passenger Engineer qualified to operate all facets of commuter rail operations within Amtrak's CS-1 Work Zone. He attended the University of Massachusetts (UMASS) concentrating his studies as an English Major, Senior Level. In 1972 he entered the University of North Texas and enrolled in Music School, leading to a Bachelor Degree Music Composition, with concentration in Piano. During that time he was given an opportunity to work on a design project which entailed an analysis of American History and a complete survey of English Literature from 650 A.D. to 1960. He graduated in 1976 and then attended Graduate School at Hartt College of Music, Hartford, CT, obtaining a teaching assistantship in Music Theory.

His employment relationship with Amtrak began in 1979 when he hired as a Trackman. He was subsequently furloughed and ultimately transferred to a Clerk's position. He worked various clerical positions until 1993; including, Janitor, Baggage Handler, Material Control Inventory Control Clerk, Block Operator and Transportation Clerk. During that time frame he worked third shift on the railroad in order to facilitate his ability to perform piano accompaniment at UMASS. He also submitted and was accepted to the writing program at UMASS where he dropped his studies in British Literature and turned his attention to American Literature, Philosophy and World History. In 1993 he transferred his position from Clerk to Train Dispatcher. In 1996 he again transferred to become a Locomotive Engineer and established seniority in the Amtrak CS-1 work zone pursuant to agreement rules.

## II.  Statement of Facts

By letter dated September 10, 2001, Claimant received a "Notice of Formal Investigation" directing him to attend an investigation on September 17, 2001, in connection with the afore stated charge alleged by the Carrier. *(Exhibit A)*  That date was postponed by mutual agreement and rescheduled by letter dated March 13, 2002. (*Exhibit B* ) Formal investigation proceedings commenced April 4, 2002, and continued over a period of five days during the course of the next several weeks, concluding May 7, 2002. Carrier's decision letter of May 13, 2002 notified Claimant that the discipline imposed was "Dismissal In All Capacities Effective Immediately." (*Exhibit C*) Said decision was rejected by the Organization and docketed for appeal to the highest designated officer of the Corporation handling claims by letter dated May 29, 2002. (*Exhibit D*) Following further, discussion in conference, August 8, 2002, said appeal was denied by letter dated August 28, 2002. (*Exhibit E*) Organization's September 4, 2002, letter rejected said decision as final and binding settlement in this matter, and requested listing for appeal before SBA 928 *(Exhibit F)* For purposes of this submission, the transcribed record of the formal investigation proceedings will be referred to hereinafter as (Tr.).

## III.  Organization's Threshold Procedural Argument:

Any argument before this Board to sustain the Carrier's decision in this matter must be rejected *ab initio* based on a fatal procedural matter which cannot be overlooked or treated lightly. This Board is intimately familiar with the governing requirements memorialized in Rule 21 *(Exhibit G)* of the parties collective bargaining agreement on this property, specifically as it applies to time limit obligations in disciplinary matters.  For ready reference, Rule 21(d)(1) reads in pertinent part: "*A Passenger Engineer directed to attend a formal investigation to determine his responsibility, if any, in connection with an act or occurrence will be notified in writing within seven days from the date of the act or occurrence or in case involving stealing or criminal offense from within seven days of the date the Corporation becomes aware of such act or occurrence.*"

3

There is no dispute that Claimant was charged in the Carrier's Notice of Formal Investigation letter of September 10, 2001 with an alleged act of insubordination on the date of August 27, 2001. In view of the findings in Section 14 of the Hearing Officers' decision letter of May 13, 2002 *(Exhibit C)*, and notwithstanding her resolve to simply excuse the Carrier's blatant ignorance to clear, unambiguous and controlling rule language; a decision presumably grounded in the well known and accepted "standard of incompetence" that thrives within the Carrier's corporate structure, there can be absolutely no doubt that the seven-day obligation was not met with conformity to the subject rule. There is no exclusion to the rule that can be persuasively argued on the basis of the instant case "involving stealing or criminal offense." There can be no dispute that fourteen days actually elapsed between August 27, 2001 (date charged) and September 10, 2001 (Notice of Formal Investigation). There can be no dispute that the respective parties to the collective bargaining agreement obviously agreed to the applicable time limits set forth.

Thus, we vigorously maintain the Carrier's case must fall based on fatal procedural error in failing to conform with well established tenets of proper notification pursuant to agreement rules. Notwithstanding additional arguendo contained herein, we respectfully ask the Board to set aside the Carrier's decision on the basis and strength of this threshold procedural argument.

## IV.  Position of the Organization

The Carrier has maliciously schemed and conspired to portray this case as a straightforward case of gross insubordination. Nothing could be further from reality; or more importantly, the truth. When viewed as a whole and in its proper context, the Carrier's primary objective becomes very clear and unmistakable  That objective was to rid itself of an unwanted employee by whatever means necessary.  Determined to achieve that end, certain Carrier officials contrived and executed an intricate web of misdirection by grossly distorting the facts in order to make them appear as something they are not.

4

The impetus that provided a vehicle for the Carrier to inaugurate its plan and move in a disciplinary fashion centers on a document entitled "The Letters From Hell". Therein, Claimant did nothing more than to voice his opinion on an internal political matter of the Organization (Tr. Exhibit P) as a member of the Brotherhood of Locomotive Engineers (BLE) in a manner which he felt appropriate. Certainly every United States citizen and, most assuredly, every member of the BLE organization enjoys the right to such freedom expression and opinion.

Nonetheless, by letter dated May 4, 2001 (Tr. Exhibit C), Claimant was notified by Mr. O'Malley, Director of Operations, that he was being held out of service. Exhibit "C" reads, in pertinent part, as follows:

> "Amtrak's Medical Director/NEC Doctor Tim Pinsky, has reviewed samples of materials reportedly written by you. Following his review, Doctor Pinsky stated that the samples "justify Mr. Carmack being deemed medically disqualified immediately pending a FFT exam."

The subject letter also directed Claimant to, "contact Company Nurse Mary Anne Letterio" for further instructions. Notwithstanding, the underlying, and devised impetus giving rise to the order at issue, which will be more fully discussed and developed hereinafter, the May 4, 2001 letter was one of the first, and certainly an integral step taken by the Carrier in initiating its plan of attack in this matter. Furthermore, Claimant was also contacted at approximately 10:00 AM, May 4, by Mr. J. White, Crew Management Services (CMS), who left a message advising him to call Nurse Letterio. At 1:05 PM, he returned Mr. White's call leaving a message that he would, in fact, contact Letterio. At 1:12 PM, he called Nurse Letterio, advised that he had been instructed to call, and inquired as to why he had been medically disqualified and the basis of Dr. Pinsky's decision. She responded by saying there was nothing she could tell him and he would be receiving a letter relative to the situation.

Claimant has been charged with insubordination. This Board well knows that the generally applied rule in such matters is "work now, grieve later." The root of that principle is founded on the common understanding that the parties to the collective bargaining will refer and handle all matters

5

of dispute within the context of the agreed upon grievance procedure set forth by the CBA. As such, that governing principle effectively precludes employees from taking matters "into their own hands" and resorting to self-help without engaging the defined grievance process. In the instant case, Claimant specifically adhered to the order given in the May 4, 2001 letter from Mr. O'Malley. He did not take matters into his own hands. He did not refuse to comply. He was not insubordinate.

Alternatively, he followed the Carrier's instructions implicitly. Moreover, he properly and timely engaged his BLE representative, Local Chairman, Mr. M. J. O'Bryan, to intercede and act on his behalf in accordance with the CBA. That fact is well established in record by Mr. O'Bryan's letter of May 8, 2001 to Mr. O'Malley. In that correspondence Mr. O'Bryan clearly alerts O'Malley that the Organization finds the Carrier's action relative to Mr. Carmack in direct violation of Agreement Rule 25(b). O'Bryan states therein:. (Tr. Exhibit E8)

> **"This is to advise that the carrier is in violation of Rule 25(b) of the BLE agreement**, which states in pertinent part: When it is <u>obvious</u> that a Passenger Engineer is medically (physically or mentally) impaired in a way that affects his service, the Corporation may hold that Passenger Engineer out of service pending the outcome of a medical examination." (Emphasis added)

> This so-called sampling of the material by Dr. Pinsky, coupled with the doctor's stated uncertainty regarding authorship, clearly do not equate to "obvious...physical or mental impairment", the standard for disqualification established by the Rule."

> Mr. O' Bryan additionally also wrote the following:

> "The carrier has intruded uninvited and unwanted into an area in which it has no business. The documents that it finds so offending were part of an **internal debate within the membership of this organization**. If such material offends the membership, the Constitution and Bylaws of the organization provide a mechanism for dealing with the author(s). **Amtrak's intrusion is illegal, unnecessary, inappropriate and definitely not appreciated.**

Mr. O'Malley responded to the above correspondence May 15, 2001 (Tr. Exhibit E11). Therein, despite the fact that Mr. Carmack had not failed to comply with any carrier instruction or directive whatsoever, he attempts to justify the Carrier's violation of Rule 25 in saying, "This is no different than an engineer being categorized as medically disqualified for failing to provide sufficient documentation to explain an existing medical condition." We maintain his justification, as such, is

6

misplaced and clearly not pertinent to the issue in dispute. His misguided reasoning for justification

is based on a condition involving a known failure to provide medical documentation, and, as such,

failed to produce any substantive basis or relevance whatsoever to the facts or conditions that existed

in the instant case. Consequently, Mr. O' Bryan appropriately responded to same in his letter of May

28, 2001. (Tr. Exhibit E9). Therein, Mr. O'Bryan reiterates and underscores the Organization's's

position when he writes the following, in pertinent part:

> "In [your] letter you quote a portion of Rule 25 of the BLE Agreement. First and foremost, the carrier has yet to produce any evidence that it is "obvious (Engineer Carmack) is medically (physically or mentally) impaired in any way that affects his service." As you well know, the material provided to the Medical Director was literally months old by the time the carrier elected to take any exception to it.
>
> You are aware that the documents in question were directed specifically to the undersigned and that they relate entirely to a political dispute with this organization, which the carrier has no business involving itself in. You are aware that as an employee of the carrier I took no exception to their content, nor did I feel in any way threatened by them. Amtrak is intruding in the business of the organization.
>
> Your attempt to escape your Rule 25 obligation by paying Engineer Carmack while he is disqualified (and we note he has not been paid to date) is transparent and futile. The rule clearly and unambiguously implies that the carrier may only disqualify an engineer when it is "obvious" than an engineer cannot perform service. This is not the case here by any stretch of the imagination. Moreover, the carrier's decision to pay Engineer Carmack while disqualified (contrary to your implication) is not remotely akin to the "insufficient documentation" scenario you paint. How you can compare the activation of the TART (which deals exclusively with workplace violence issues) with a case of "insufficient documentation" is beyond comprehension."
>
> At the barest minimum the carrier has violated the spirit and intent of Rule 25. At worst it has humiliated an employee without evidence and caused many in the work force to question if they will be next. The carrier has yet to meet the clearly worded standard of "obvious...impair(ment)." Having not meet that standard the carrier may not withhold Engineer Carmack from service, regardless of what terminology it wishes to apply. Despite the assertion to the contrary, the carrier is very definitely in violation of Rule 25.
>
> The organization requests that you provide both Engineer Carmack, and the undersigned as his representative, with definitive evidence that supports the decision to disqualify him from service. Absent such evidence, which under the agreement must show that Engineer Carmack is "obviously...mentally impaired in a way that affects his service," we demand he be immediately returned to service."

In addition to Mr. O'Bryan's timely and very thorough handling of the dispute thus far, Mr.

Carmack also assisted in the Organization's resolution effort by contacting Amtrak's medial

department himself. In his certified letter of May 24, 2001 to Dr. Pinsky, which is reflected as being

properly received by the Carrier (Tr. Exhibit E3a), in addition to requesting that he be supplied with,

"...copies of all documents and correspondence (medical or otherwise) referring to my person in any

way", Claimant made the following written request to Dr. Pinsky, it states:

> "...please supply me with a valid qualification and explanation of any "deemed"basis
> for disqualifying me including, but not limited to, a specific diagnosis. Please include
> specific validation of your legal and medical qualification to make such a judgement.
> Please include a complete explanation of an "FFD exam" including what FFD stands
> for, what it is, and what it entails. Please include legal basis for you decision. Your
> prompt attention to this matter will be greatly appreciated."

Failing to receive any type of response whatsoever from Dr. Pinsky, Claimant wrote him again

by certified mail, with receipt of same acknowledged as indicated in the record. In his letter of July

27, 2001 (Tr. Exhibit E3b), Mr Carmack reiterated his request of May 24, 2001, and additionally

advised the following:

> " If there are any fees for searching or copying the records, please let me know
> before you fill my request. Or, please supply the records without informing me of the
> cost if the fees do not exceed $5.00, which I agree to pay. If you deny all or any part
> of this request, please cite each specific exemption you think justifies your refusal to
> release the information and notify me of appeal procedures available under law."

Held out of service now for nearly two months and being threatened with severe disciplinary

action at this point, Mr. Carmack was understandably frustrated by Pinsky's obvious refusal to

provide the information already requested twice from his office, not to mention Mr. O'Bryan's

previous request of the Carrier for same to no avail, consequently, he wrote Dr. Pinsky again on July

31, 2001. (Tr. Exhibit E3d). Now, for the third time, he again implores Dr. Pinsky to provide him

with a least some form of explanation. He states: "I am at a loss to understand these developments.

There is no basis for medical disqualification and you refuse to supply me with one."


Still, despite all the numerous and good faith attempts made by the Claimant, and the

Organization on his behalf, no response was ever received from Dr. Pinsky. It is not until he (Pinsky)

is questioned by Claimant's representative, R. S. Prone, Local Chairman, during the course of direct

testimony can one begin to make any sense of his continued refusal to provide the information that

8

has been repeatedly requested. When questioned by Mr. Prone he responds as follows: (Tr. at p. 101)

Prone: Who first sent you the materials in which you reviewed and chose to medically disqualify Engineer Carmack?

Pinsky: I believe they came from the Tart team.

Prone: Did they have a signature on them?

Prone: the

Pinsky: the materials or

Prone: Was it a report? Or did it have a cover letter? Do you have that in your file?

Pinsky: I'll check the file. I just wanted to make sure I understood the question. The materials that were sent, did they have a cover letter is that what you are asking?

Prone: Yeah, did you, did you medically disqualify Engineer Carmack?

Pinsky: Yes

Gaines: Was the answer yes?

Pinsky: Yes

Gaines: Yes

Prone: Based on what?

Pinsky: Based on material I was presented with on May 3, 2001; and I guess to answer your question, your earlier question it was presented to me by the nurse at the time, Maryann Letterio, she relayed that it was from Lou DePhillips of the TART Team, and Suzanne Allan of Boston Human Resources Department?

Pinsky's testimony continues at (Tr. pps. 105-107)

Prone: Was his signature on the package that came from Mr. DePhillips?

Pinsky: I don't know.

Prone: Is there anyway of verifying it quickly, or would it take a long time?

Pinsky: Well, I looked through it a little bit, and it looks like there was email correspondence that brought this to my attention, or brought it to Marianne's

attention.  (**Emphasis added**)

Prone: But did you receive a cover letter from Mr. DePhillips, identifying him as a member of the TART team, with the materials?  Hello, Dr. Pinsky?

Pinsky: Yes, yes, he was identified as part of the TART team.

Prone: Was that a cover letter from Mr. DePhillips or was in email?

Pinsky: It was in email as far as I can tell.

Prone: Okay.  Have you ever personally met Engineer Carmack?

Pinsky: No.  I have not.

Prone: Have you ever spoken to him?

Pinsky: I don't believe so.

Prone: Has he ever tried to contact you?

Pinsky: He's written me some letters.

Prone: Has he ever tried to call you?

Pinsky: That I don't recall.

Prone: Did you ever answer his letters?

Pinsky: Not personally.

Prone: Why not?

Pinsky: Well I referred his letter, at least one of them to the legal department; and they advised me not to.

Upon recall, Dr. Pinsky additionally gave this testimony, he responds as follows: (Tr. p. 392)

Prone: Didn't you testify the last time that the law department advised you not send Mr. Carmack's medical file back to him?

Pinsky: No, they advised me that I didn't need to justify my own credentials or explain my medical legal opinions to Mr. Carmack.

Prone: Even though he is the one under scrutiny here?

Pinsky: Right.

10

Prone: So in other words, the engineer wrote you a letter and you didn't respond to it?

Pinsky: That's correct.

Prone: And he wanted his medical file, was that the subject of the letter?

Pinsky: That was part of the letter.

Prone: And you refused to give it to him?

Pinsky: No I didn't.

Prone: You just refused to respond to him, right?

Pinsky: Sorry, your circles, your questions keep going in circles and I'm trying to follow them logically here.

In spite of Dr. Pinsky's assertion that Mr. Prone's questions were "going in circles", which they were not, we maintain his testimony offers very telling information and speaks loudly to the set of circumstances that has been placed into motion by the Carrier. We contend the following uncontested facts are evident and fully supported in the record of his testimony: 1.) He medically disqualified the Claimant from service on the basis of the information he received from Nurse Letterio on May 3, 2001, and that information was in the form of email. 2). The subject email was from Mr. L. DePhillips of the Labor Relations Department and the Boston TART Team. 3). He never spoke with or examined Mr. Carmack prior to or subsequent to his medical determination to disqualify him from service. 4) He received Mr. Carmack's certified letters requesting information. 5.) He forwarded same to the Amtrak legal department, and on the basis of counsel he received from the legal department, he elected not to respond to Claimant.

Also found in the record, according to the testimony of Division Road Foreman DeModena, who played a pivotal role in the Carrier's deceitful and equally disgraceful plan, the aforementioned internal BLE document, entitled "Letters From Hell", (Tr. Exhibit E5) was somehow

11

inexplicably,"...placed on his desk." We find it noteworthy to mention the fact that Road Foreman DeModena and Mr. Rae, the Carrier's charging officer in this case, share the same office space, which is normally kept locked. (Tr. at pps. 164-165) In fact, given Mr. Rae's unfettered access to Mr. DeModena's office, we suggest there is little doubt, if any, as to how the subject document found its ways to Mr.DeModena.

In any event, during direct testimony, carrier witness DeModena, who presently serves as a Chief Petty Officer in the United States Coast Guard, demonstrated that he knew very little beyond his name, title, and a virtually inspirational degree of familiarity with William Shakespeare's Hamlet, despite his modest assertion to the contrary. He did, however, offer the tortured record in this case a considerable degree of testimony about how he "felt threatened, quite frightened"and feared he was "going to be killed off". He also testified that his feelings, as such, manifested upon his "reading - but not studying" the"Letters From Hell" document, and directly led to him calling Mr. DePhillips from the TART Team and filing a Work Place Violence Report on April 12, 2001.(Tr. Exhibit 6)

From the best we can adduce from the record, it seems that the basis of Mr. DeModena's asserted overwhelming fear for his personal safety, and feelings that he may be in personal danger were founded upon the undisputed fact that he, Mr. O'Bryan, Mr. Carmack, and several other employees were named in the cast of players of the "Letters From Hell" parody, and because his and Mr.O'Bryan's characters die in Shakespeare's version of the play. It is important for the Board to note that the death of the characters is not depicted in subject parody.

We contend, it is here where the contrived scheme to snare Mr. Carmack for the purpose of assessing discipline on the basis of insubordination begins to emit an unsavory smell and demonstrate overt signs of suspect behavior by the Carrier. It is virtually impossible for the Organization to overcome or successfully challenge Mr. DeModena's allegation of fear and impending threat.

Moreover, we fully recognize the deference this Board's gives the hearing officer in making credibility determinations of witnesses. However, we vigorously maintain, given the fact that Mr. DeModena has served as Claimant's supervisor for numerous years without any threatening behavior ever emerging from Mr. Carmack, and coupled with the fact that numerous employees who have worked directly with him over the course of his employment relationship (Tr. Exhibit E14) have characterized his behavior as anything but threatening, we contend Mr. DeModena's testimony as to his asserted personal fear lacks any degree of reasonable foundation, and must be viewed as unpersuasive.

Assuming for a moment that Mr. DeModena's stated concerns were genuine, we will examine the facts in terms of his workplace violence report and the validity of same. First, DeModena testified to have called Mr. DePhillips immediately upon finding the document at issue on his desk. Furthermore, he also filed a workplace violence report the following day April 12, 2001.

According to Mr. DePhillips and his uncontested testimony, contrary to Amtrak's governing Workplace Violence Policy PERS-42, (Tr. at Exhibit E4) he only consulted with his fellow TART Team members, Captain Smith and Suzanne Allan, after he unilaterally decided on an appropriate course of action. That action was to immediately fax what he found to be the appropriate section of the 44-page document at issue to Marianne Letterio. He further says, (Tr. p. 253-254) "...An individual is threatened and he comes to me, I'm not going to the first thing I'm not going to say to him, did you fill out the form, I mean that's kind of like trivial. Forms or no forms, I'm going to deal with it verbal or otherwise. And, deal with it he did, in a manner the Organization finds all too reminiscent of General Alexander Haig's behavior during the attempted assassination on President Regan. The following exchange takes place between Mr. DePhillips and Mr. Prone in the record. (Tr. at pps. 254-256)

Prone: Mr. Carmack is yielding to, Mr. DePhillips did you convene the entire TART team to examine this case?

13

DePhillips: No, I didn't convene the team.

Prone: Did you discuss the materials with Captain Smith and Suzanne Allan?

DePhillips: After I concluded my actions, not before.

Prone: And can you please for the record, summarize what actions you took.

DePhillips: I made an initial assessment and then I faxed that down to Letterio as we discussed before.

Gaines: To the medical department? Is that who

DePhillips: Yes

Gaines: you're referring to?

DePhillips: Yes

Prone: Did you consider this Hamlet parody a threat?

DePhillips: Mr. DeModena considered it a threat and considering the slain characters.

Prone: Did you ever contact Captain Smith of the Amtrak Police Department before you sent this material.

DePhillips: I don't believe I did.

Prone: Don't you think it would have been a good idea to call him? Since he was a member of the TART team and he was a police officer and you consider Mr. DeModena thought it was a threat?

DePhillips: No. I've made many individual assessments without contacting my fellow members.

Prone: Is what your saying you acted unilaterally in this case?

Rae: Objection

DePhillips: I've done that on many occasions.

Gaines: Mr. DePhillips was indicating that he's made many individual assessments about___ the TART team.

Prone: I think I, are we on the record?

14

Gaines: Yeah

Prone: Okay. I remember where I left off.  Mr. DePhillips, did you ever meet with Suzanne Allan of the TART team?

DePhillips: Regarding this issue?

Prone: Yes

DePhillips: I made the assessment, I didn't meet with Suzanne. **(emphasis added)**

Prone: Did you ever discuss any of the materials?  Did you ever show her any of the materials?

DePhillips: Post, post assessment, yeah.  I believe I sent her and Captain Smith a packet, package was already

Prone: Yeah, did you send her the entire packet?

DePhillips: I believe I did, yes.  **(emphasis added)**

Prone: But that was afterwards?

DePhillips: Yes

Prone; And, did they have anything to do with the selection of letters that you first faxed or material that you first faxed to Dr. Pinsky

DePhillips: No, they were they were involved post, as I said.

Prone: What purpose does being involved post serve?

DePhillips: I share the material with them.

Prone: Did, weren't the decisions already made?

DePhillips: My, my assessment, I made mine.  I make many individual assessments because of the time factor involved or because the supervisor you know is looking to have a quick action; so I make those assessments.


Based on the afore stated testimony of Mr. DePhillips. several more conclusions can be drawn by the Board, 1.)  Mr. DePhillips did not consult other members of the TART Team prior to faxing

15

the information to the medical department. 2.) His stated reason for acting unilaterally was based on his perception alone as to the urgency the situation brought forward. 3.) He only contacted other members of the TART after taking initial action. 4.) His action in forwarding the information to the medical department was immediate. 5.) He **sent** Captain Smith and Suzanne Allan the entire packet of material comprising the Letters From Hell document.

Initially, exception is taken to Mr. DePhillips failing to conform to the protocol established by the Carrier's own unilaterally imposed PERS-42 policy. Moreover, we maintain his behavior in this instance completely undermined the very intent of the policy he asserts to be enforcing. Most importantly, we find his testimony to be in conflict with that of carrier witness Suzanne Allan, specifically in terms of how the subject document was provided to her, and then reviewed between her and Mr. DePhilllips. According to the testimony of DePhillips when questioned by Mr. Prone, he said that he **sent** her the entire packet; he specifically says, ."I believe I did, yes."

Ms. Allan is the manger of Human Resources in Boston and a member of the TART. Ms. Allan's recall of the circumstances involved in this matter were vague, at best. Additionally, she appeared to know very little, if anything, with regard to her obligation as a member of the TART. In fact, she appeared to be at a total loss and could not even identify what "level"of threat the circumstance under review posed based on Amtrak's definition of same in PERS-42. Turning to her testimony, Ms. Allan offers the following: (Tr. at pps. 217-220)

Prone: Who came to you with the complaint about Mr. Carmack?

Allan: No one came to me directly with a complaint. I believe that there was a complaint brought to the attention of Lou DePhillips, one of the members of the TART team.

Prone: Did he convene the TART team?

Allan: We reviewed, he called he contacted me after he received the initial complaint

16

from the employee and reviewed it with me.

Prone: Did you review the complaint in the, the origin in of the complaint with Mr.

DePhillips in person? Or via the telephone?

Allan: I believe it was via telephone.

Prone: Did you happen to review any of the materials that were allegedly threatening?

Allan: Yes we reviewed the materials.

Prone: Okay, where did you get your copies of the materials?

Allan: I believe Lou, as I best recollect Lou had **forwarded** me the materials?

**(emphasis added)**

Prone: How many pages were they? Do you remember?

Allan: I don't know.

Prone: Was it, could you give me a little bit of approximation? Was it a few pages,

was it 30 or 40 pages, or?.

Allan: I honestly, I honestly don't remember how many pages to testify accurately

about that.

Prone: Do you have copies of the material that he forwarded you?

Allan: I don't think I do, no.

Prone: What did you do with them?

At this point Ms. Allan begins to deviate from her previous testimony as to how she came to review

the material in question, her testimony continues:

Allan: I believe at the time Lou and I reviewed the information.

Gaines: Stop. I thought I had pressed the button for some reason. Go ahead.

Allan: I believe Lou and I reviewed the information together. I'm not sure if he came

over to my office or we reviewed the information, but I I don't recall I believe **I**

**thought he came, I think my recollection is he may have come over to my office**

**with the document, but**

17

Prone: But you can't remember.

Allan: I don't remember how many pages it was.

Prone: And you can't remember if he came over to the office either?

Rae: Objection, she's already answered the question.

Gaines: She answered to the

Allan: I believe to the best of my

Gaines: He's trying to jog her, hold on I'm sorry. He's try to jog her memory. The questions are permissible; they're not g badgering, but continue.

Prone: Do you happen to remember what was contained in the material that Mr. DePhillips showed you that was considered threatening or do you happen to remember the contents fo what he gave you?

Allan: I remember the overall idea of what the content was. It was, I believe an outline of a play that Shakespeare or Hamlet or a writer had done and this was sort of a reissuance in some manner of that play. I don't recall the exact play but I believe it was Shakespeare's Hamlet.

Prone: And is that the only thing you remember about the materials that Mr. DePhillips forwarded you or you examined?

Allan: I remember the the materials containing a kind of parody involving two characters, let's say, and the the the lead character somehow doing harm to some characters that were in the play?

Prone: Do you remember any letters from Amtrak or letters from the BLE in that packet from Mike O'Bryan or from Mike O'Malley?

Allan: I don't, no.

Prone: Do you remember any information operational information like north side lineups of CETC logs in there?

Allan: No.

18

Prone: Do you happen to know if Captain Smith was notified of this?

Allan: I don't.

Prone: Do you know that when, are you privy to the email that was sent from the TART team to Dr. Pinsky, that accompanied the materials the allegedly threatening materials?

Allan: I may have been cc'd on that email but I don't have knowledge or recollection as I sit right now. No.

Prone: Do you have a copy of that?

Allan: No.

Based on Ms. Allan's testimony we maintain the following is evident, 1.) She was not consulted by Mr. DePhillips before he contacted the medical department on his own. 2.) First she testified that she reviewed the material in question over the telephone, then she recants by saying she "thinks" she remembers him coming over to her office to review material. 3.) Her testimony raises substantial doubt as to the veracity of Mr. DePhillips testimony with regard to how the material, which served as the **only basis** for Claimant's medical disqualification, was communicated between the TART for review. 4.) She had no idea of whether or not Captain Smith, the other TART member, had been consulted in this matter. 5.) She had no recollection whatsoever of the other thirty-nine (39) pages of material that are included in the "Letters From Hell" document, despite the fact that Mr. DePhillips testified that he sent her the **entire** packet. 6.) She could not explain what level of incident was involved in this case consistent with the PERS-42 policy. 7.) She only had vague recall of the situation entailing a play by Shakespeare and that it somehow involved Mr. DeModena. Based on her testimony, once again we direct the Board to carefully weigh Mr. DePhillips's testimony in terms of overall veracity given the conflict between his statements and that of Ms. Allan's testimony.

19

Alas, we arrive at the heart of "*much ado about nothing.*" Five (5) pages of the forty-four (44) page document offered a satirical parody on the works of William Shakespeare. The parody is entitled "Hamlet, Prince of Commuter Rail." Therein, the names of 10 employees are reflected as the cast of characters in the parody. The characters are identical to those of Shakespeare's. Additionally, another of the five pages makes reference to Lucifer, Prince of Darkness. The entire five pages at issue here are nothing more than a satire. Webster defines satire as, 1: a literary work holding up human vices and follies to ridicule or scorn, 2: trenchant wit, irony or sarcasm used to expose and discredit vice or folly.

Thus far, we find it is well established in the record that the only basis of Dr. Pinsky's determination to medically disqualify Mr. Carmack was the Letters From Hell document. Upon review the Board will find that said document (Tr. Exhibit E5) is an extensive compilation of written material and documents specifically intended and pertinent to addressing BLE matters within the Organization's infrastructure. It consists of forty-four (44) pages of various documents from assorted dates and spans a window of time approximately seven (7) months long.

The document contents range from several letters of personal BLE correspondence between Claimant and his representative, Michael J. O'Bryan, BLE Local Chairman, to a poorly animated cartoon of Godzilla. It also contains correspondence between Claimant and Mr. O'Malley, Assistant General Manager and Mr. O'Connor, General Manager, a Petition to unseat Mr. O'Bryan from his office as a BLE representative, daily equipment line-up sheets, records of train movements, delay reports, equipment condition reports (Map 100), and copies of Claimant's time slips. All of the aforesaid documents chronicle and are directly related to an internal BLE debate over the manner in which the local division of the Organization conducts business and provides representation for its membership.

20

Simply put, Claimant and Local Chairman O'Bryan were at odds as to how things should be done. From the Organization's viewpoint, we honestly see the document as nothing more than an extension of a long-winded struggle for superiority and righteousness which has persisted between Local Chairman O'Bryan and Claimant without relief, and for more years than the undersigned Organization representative cares to count. Moreover, we strongly maintain that anyone who genuinely reviewed the subject document, with any semblance of reasonable thought and logic, would fail to find even the slightest hint of threat.

As such, we contend the document at issue is not at all threatening, and was never intended to be threatening, to Mr. DeModena or anybody else. We strongly maintain that it should have been taken and treated for what it actually was; namely, a satirical parody of little consequence, purposely designed and written to Mr. O'Bryan in order to "literally" amplify Mr. Carmack's discontent with the Organization's conduct as it applied to his personal situation, and in more overall terms, pertinent to the general effectiveness of the Organization. We would also point out that this 7 month old document was posted in various states and forms, as well as being strewn about the commuter service property for months prior to any carrier action being undertaken.

We will now direct the Board to the most telling evidence of probative value in the record. That evidence is an unrefuted email document from Mr. DePhillips to Mr. O'Malley and Mr. DeModena, dated May 3, 2001. (Tr. Exhibit E18) We contend it reveals the Carrier's true motive in the instant case, and, as such, underpins our core argument that the basis of Dr. Pinsky's decision to medically disqualify Claimant was not objective or fact based, but was nothing more than a step in Mr. DePhillips purposely contrived scheme to achieve one desired result, Mr. Carmack's dismissal.

We remind the Board that Mr. DeModena filed his workplace violence report on April 12, 2001. Mr. DePhillips testified that because he was so concerned over Mr. DeModena's perception

21

that a threat to his personal well being was imminent, he acted without consulting the TART and immediately faxed the alleged threatening document to Marianne Letterio for Dr. Pinsky's review that day. Therefore, it is well within reason to conclude that the document which ultimately served as the foundation of Pinsky's decision to disqualify was in the hands of the medical department that day. However, despite that fact; and all the controversy that arose thereafter with the filing of the workplace violence report, the stated concern and fear about the alleged threat posed by the subject document etc., absolutely no action was taken at that point by the medical department or anyone else for that matter. It was not until, Mr. DePhillips May 3, 2001 email, which was forwarded to Nurse Letterio and Dr. Pinsky by Suzanne Allan, and which offered precise guidance as to the manner that would provide a means and ability to move disciplinary charges on the "grounds of insubordination and a removal from service" was any formal action taken against Claimant.

Now, twenty-one (21) days after receiving the workplace violence report and doing absolutely nothing about it, Dr. Pinsky finally knew and understood what was expected of him on the basis of the direction offered in DePhillips email. At that point, he simply moved to notify Mr. O'Malley via Marianne Letterio's May 3rd email, and Claimant was notified that he was medically disqualified by virtue of Mr. O'Malley's letter dated May 4, 2001. (Tr. at Exhibit C).

In view of the above, we submit the record offers compelling evidence that the Carrier's motives and action in this matter were premeditated, specifically designed with a desired purpose, set in place, and then orchestrated as per Mr. DePhillips instructions in order to entrap Mr. Carmack in a situation that would offer an appearance and some basis for Carrier argument that he was insubordinate based on his clearly stated concerns regarding the confidentiality of the psychiatric evaluation he was ordered to undergo. We assert there were two lynchpins involved in the Carrier's plan. First, Mr. DeModena assertion that he was threatened by his reading of the Letters From Hell. And, second, Dr. Pinsky's action to disqualify on the basis of that material contained therein.

In that specific regard, we find DeModena's assertions thoroughly unconvincing and absent of any probative merit. Furthermore, we submit to the Board that Dr. Pinsky's action to disqualify was contrived, unreasonable, and therefore inappropriate.

## VI. Conclusion

In addition to our threshold procedural argument, and in view of the additional facts and merit arguments contained herein, we adamantly maintain that Claimant was not insubordinate and therefore his dismissal is wholly unwarranted. We make that claim for two very clear reasons. First, despite the lack of merit and foundation to the Carrier's order for him to submit to a FFD psychiatric exam, he did, in fact comply with that order. He reported, with Mr. O'Bryan, to Dr. Vasile as directed. However, because of Mr. Carmack's valid and expressed concerns relative to the release of personal information that would be generated by the evaluation and submitted to persons unknown in the Carrier's employ, it was Dr. Vasile, not Claimant, who chose not to conduct the exam. He indicated as much to Amtrak in his April 2, 2002 letter stating, "...I did not wish to proceed given his concerns." (Tr. Exhibit R).

Second, and most importantly, this Board well knows that in order to successfully prove dismissal is appropriate in a case involving insubordination, certain qualifications must be achieved. Although the Carrier did its level best to meet that obligation within Mr. DePhillips devious scheme, it simply failed to meet the "reasonable" standard necessary. Absent a "reasonable and work related order, which was clearly the circumstance in the instant case, the charges were not proven and the Carrier's case must fail.

We respectfully ask the Board to give careful consideration to our arguments, and to set the aside the Carrier's wholly unwarranted and unjustified decision by reinstating Mr. Carmack in accordance with our stated claim of appeal.

23

Respectfully submitted,

Mark B. Kenny
General Chairman

24

## TABLE OF EXHIBITS

**EXHIBIT "A"**      Notice of Investigation - September 10, 2001

**EXHIBIT "B"**      Rescheduling Letter - March 13, 2002

**EXHIBIT "C"**      Decision Letter - May 13, 2002

**EXHIBIT "D"**      Organization's Letter of Appeal - May 29, 2002

**EXHIBIT "E"**      Carrier's Letter of Denial - August 28, 2002

**EXHIBIT "F"**      Organization's Letter of Rejection - September 4, 2002
Listing for the Board - September 4, 2002

**EXHIBIT "G"**      Rule 21

# EMPLOYEE
# EXHIBIT
# "A"

National Railroad Passenger Corporation, Two South Station, Boston, MA. 02110-2215



September 10, 2001

NOTICE OF FORMAL INVESTIGATION
CERTIFIED MAIL 7000 0600 0028 6411 2762

FILE NO: 01-049

Mr. Joseph T. Carmack
398 Columbus Avenue # 130
Boston, MA 02116

Dear Mr. Carmack:

You are hereby directed to appear for a formal investigation indicated below:

Date:        September 17, 2001
Time:        11:30AM
Place:       253 Summer Street
             2nd Floor
             Boston, MA. 02110

This notice is issued in connection with the occurrence (s) outlined below:
On Friday, September 7, 2001, the Customer Service/Commuter Rail
Transportation Office was contacted by Amtrak's Medical Director's Office, and
informed that you failed to appear for an appointment with Dr. Vasile on August
27, 2001, at 4:00 P.M., a date and time negotiated and agreed by both of you.

**Charge I:**    Development of the facts and determination of your responsibility, if any, in that
on August 27, 2001, at 4:00 P.M., you allegedly failed to appear for a fitness for
duty evaluation with Dr. Vasile. In a letter dated July 24, 2001, you were
instructed by Mr. O'Malley, Director of Operations, that "your failure to appear,
your refusal to cooperate with the physician, or adopt some other tactic to
frustrate this evaluation would initiate the formal discipline process for gross
insubordination".

Your alleged failure to comply with this directive constitutes a direct violation of
Amtrak's 'Standard of Excellence', under the section titled *'Professional and*

*Personal Conduct'*, specifically Teamwork, which reads in pertinent part: "[F]ollowing instructions ....you must comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers."

You may produce any witness you so desire and you may be accompanied by a representative as provided for in your current and governing agreement without expense to the National Passenger Corporation.

All requests for postponement of this investigation must be handled through the Division Hearing Office at 617-345-7667 or by U.S. Mail at 253 Summer Street, Boston, MA. 02210.

Very Truly Yours,

M.J. O'Malley
Director of Operations

Cc:     Hearing Officer
        F.J. O'Connor Jr., Charging Officer
        Dr. Russell G. Vasile M.D., Company Witness
        Dr. T. Pinsky, Company Witness
        Mr. M.J. O'Bryan, BLE Representative

# EMPLOYEE
# EXHIBIT
# "B"



Rescheduling Letter
FEDEX U.S. AIRBILL

March 13, 2002

Mr. Joseph T. Carmack
398 Columbus Avenue #130
Boston, MA 02116

Re:    File No.:    01-049

Dear Mr. Carmack:

This refers to Notice of Investigation, Case File No. 01-049, which scheduled your proceedings on September 17, 2001.

This Investigation was postponed by the Union, and has now been rescheduled as indicated below:

| | |
|---|---|
| **Date:** | **Thursday, April 4, 2002** |
| **Time:** | **11:00 am** |
| **Place:** | **253 Summer Street    2nd floor** |
| | **Boston, MA 02110** |

Any further postponement request will be granted only for a valid and verifiable reason and must be made through the Division Hearing Office at (202) 906-3020, (ATS 777-3020), or by U.S. Mail to: Angela C. Graham Administrator, 60 Massachusetts Avenue, NE 3rd Floor Washington, DC 20002.

Sincerely,

*Angela C. Graham*

Angela C. Graham
Administrator

cc:    Deborah Gaines, Hearing Officer
       W. Rae, Charging Officer (Please ensure all witnesses are notified and available)
       M.J. O'Bryan, Union (Fed Ex)
       File

# EMPLOYEE
# EXHIBIT
# "C"

# DECISION LETTER

May 13, 2002

Joseph T. Carmack
398 Columbus Avenue # 130
Boston, MA 02116

File No.: 01-049

Dear Mr. Carmack:

By Notice of Investigation, dated September 10, 2001, you were charged with the following:

> Charge I:    Development of the facts and determination of your responsibility, if any, in that on August 27, 2001, and at 4:00 P.M., you allegedly failed to appear for a fitness for duty evaluation with Dr. Vasile. In a letter dated July 24, 2001, you were instructed by Mr. O'Malley, Director of Operations, that "your failure to appear, your refusal to cooperate with the physician, or adopt some other tactic to frustrate this evaluation would initiate the formal discipline process for gross insubordination."

> Your alleged failure to comply with this directive constitutes a direct violation of Amtrak's 'Standard of Excellence', under the section titled 'Professional and Personal Conduct', specifically Teamwork, which reads in pertinent part: "[F]ollowing instructions . . ..you must comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers."

The undersigned-hearing officer conducted an investigation into the above-quoted charges on the following dates: April 4, 2002, April 23, 2002, April 24, 2002 and May 7, 2002, after one postponement at the request of your Organization. You were present throughout the entire proceeding and represented by your BLE Representative, Richard Prone.

Testimony adduced and documentation submitted established the following:
1. At all times during your employment, Amtrak's Standards of Excellence were in effect and applicable to you, as they are to all Amtrak employees.
2. Carrier maintains a Workplace Violence Policy (PERS –42). The policy's stated purpose is to "establish guidelines and protocols for the handling of threats or acts of violence in the Amtrak workplace." Threats, under the policy, can include written communications or acts to instigate or encourage violence. The policy indicates that "even without an actual threat, employees should report any behavior they have witnessed which they regard as threatening or violent . . ."

3. On April 11, 2001, Joseph DeModena, Division Road Foreman for Commuter Service, found a large packet of written materials, entitled "Letters From Hell", on his desk. According to Mr. DeModena, he did not know how the packet got on his desk, but the majority of the materials within the packet were authored by you.

4. Mr. DeModena testified that he found portions of the packet to be very disturbing. Specifically, he noted the parody of Hamlet, which included a casting page which was addressed to God and provided that "this play has a messy ending more to my liking" and was signed under the name, "Lucifer". The parody had Mr. DeModena cast as Rosencrantz, a character who is murdered.

5. Mr. DeModena testified that he reported the situation to Lou DePhillips, Director of Labor Relations by phone that day because he found the materials disturbing and threatening. He was provided a complaint form that he completed the next day.

The Organization argues that Mr. DeModena had no reason to feel threatened by the material. First, they note that the material was not directed at Mr. DeModena. The material was related to an internal union dispute between you and BLE local president, Mr. O'Bryan. They note that the material had been written several months earlier. While that may be true, I find no reason to discredit Mr. DeModena's testimony regarding his perception of the materials. He found them on his desk and had previous disputes with you. Therefore, the vague nature of the materials, especially the parody, in which his character was murdered, and your commentary that you liked this ending better than the Shakespearean history plays, could reasonably cause a person to feel threatened. The workplace violence policy is clear that the nature of reportable incidents includes a broad range of behaviors and threats do not have to be imminent.

6. The evidence established that Mr. Lou DePhillips, Labor Relations Director, is a member of the Threat Assessment and Review Team (TART), which is charged with evaluating workplace violence complaints and determining what, if any, action should be taken. Mr. DePhillips testified that he reviewed the materials left on DeModena's desk and consulted with fellow TART team members, Captain Smith of the Amtrak Police and Suzanne Allen, Director of Human Resources. He stated that he came to the conclusion that the materials should be reviewed by the Medical Department. Both Ms. Allen and Detective Smith corroborated this account.

7. The evidence established that initially, Dr. Pinsky, Medical Director for the Northeast Corridor, was provided with only a select number of pages from the "Letters from Hell" packet. Dr. Pinsky testified that he reviewed the selected pages at their request. He found them disturbing and questioned your fitness for duty. As a result, he concurred that you should be disqualified from service pending a fitness for duty examination. The Medical Department notified Mr. O'Malley of this finding by email communication on May 3, 2001.

8. By letter dated May 4, 2001, Mr. O'Malley, Director of Operations for Commuter Rail, advised you that you were being held out of service, with pay, pending a fitness for duty examination, based upon the writings that were submitted to Dr.

Pinsky. An appointment with Dr. Vasili was arranged for you by the Medical Department for June 4, 2001. You were advised of this appointment by letter dated May 17, 2001.

9. On June 5, 2001, Mr. O'Malley received an email from the Medical Department advising him that you had canceled the appointment with Dr. Vasili. As a result, Mr. O'Malley wrote you a letter on June 8, 2001 in which he advised you that as a result of your canceling the appointment, your pay status was changed to "without pay". In addition, he advised you that you needed to reschedule the appointment.

10. On June 27, 2001, you went to Dr. Vasili's office with your local President, Mike O'Brien. After discussing your concerns about confidentiality and the need for a psychiatric examination, you refused to submit for the evaluation.

11. On July 24, 2001, Mr. O'Malley advised you by letter that he was providing you one last opportunity to attend the fitness for duty examination. His letter advised:

> "If you either fail to appear, refuse to cooperate with the physician, or adopt some other tactic to frustrate the evaluation, I will then place your behavior within the formal process. Such behavior will lead me to issue charges for gross insubordination and possibly contrary activities. If you have any doubts or questions as to what is expected, please contact me at (717) 222-3650."

12. On September 5, 2001, Mr. O'Malley received an email from the Medical Department advising him that a letter from Dr. Vasili was being sent to him. The letter, which was received by the Medical Department on September 4, 2001, indicated that you refused to undergo the exam.

While you testified that you did not specifically refuse, I find that the conditions you placed upon the exam constituted a refusal.

13. Based upon the record as a whole, I find sufficient evidence to sustain the charge against you. Carrier's Medical Director determined that a fitness for duty exam was necessary based upon his review of materials that contained references to Amtrak supervisors and co-workers. After several attempts to have you undergo the examination, you failed to do so, even after being warned that such failure would be considered insubordination.

The Organization argues that Mr. DeModena's complaint was an attempt to get back at you for causing him problems. While there was evidence that you had been counseled for operational incidents, I do not find that to be sufficient to determine that Mr. DeModena manufactured this incident. While it is not clear how the "Letters from Hell" were delivered to Mr. DeModena, it is reasonable that upon finding them, Mr. DeModena would consider them disturbing and threatening, especially if you and he had been having any kind of difficulties. The materials in question contain dark humor that has the potential to be interpreted in many ways. The fact that Mr. DeModena was cast in the role of a character that is murdered could reasonably cause him concern. The workplace violence policy

While the Organization argues that Dr. Pinsky's decision to disqualify you pending a fitness for duty examination constituted the determination of the Carrier's physician, I find that reading of the contract to be wrong. Dr. Pinsky did not examine you. Rather, he reviewed a situation (your writings) and found that there was a question about whether you were fit for duty. As a result, he disqualified you pending a FFD exam.

Finally, I do not find sufficient justification for your decision not to comply with Mr. O'Malley's directive to you to undergo the fitness for duty examination. Amtrak's Standards of Excellence Provide, in pertinent part:

> "Therefore, you must comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers.

> The only exception to the above requirement arises when compliance with a particular instruction would cause a clear, immediate danger to you, your fellow employees, our customers, the public or company property."

Refusal to obey a directive is justified only when compliance will cause clear and imminent danger. While I credit your testimony that you had fears regarding the confidentiality of the exam and the repercussions of the exam on you, I do not find them to be the type of clear and imminent harm contemplated under the Standards of Excellence. The examination results would have been reported to Amtrak's Medical Department. Thus there was no objective harm that could result. Being held out of service based upon the finding is not a danger as defined under the standards of excellence.

Nor do I find Dr. Anne Gurion's notes sufficient evidence that complying with the fitness for duty exam would result in imminent danger to you. Dr. Gurion's May note indicates that she agreed "with Mr. Carmack that a forced, nonconfidential psychiatric consultaon would be inadvisable for medical reasons". This letter provides no basis to determine what type of harm you would face. Moreover, the May 30, 2001 letter suggests she bases this opinion on your representation of what the exam would entail. Given the documentation from Dr. Vasili, I don't believe that you properly characterized the exam to Dr. Gurion and, therefore, her opinion seems based upon incomplete information.

14. Finally, although you apparently refused to meet with Dr. Vasili on August 28, 2001, the information was not forwarded to the Medical Department until September 4, 2001 and to Mr. O'Malley on September 5, 2001. While Rule 21 of the BLE agreement provides that charges must be issued within seven days of the incident, unless it is a criminal offense, I cannot find that the Carrier had any undue delay in this case. First, because the incident involved a medical examination, Mr. O'Malley would not have any ability to determine your

compliance until he received information from the Medical Department. He received it on September 5, 2001, the date the charges were issued.

Based on the foregoing, I find that Carrier proved the charges against you. A copy of the transcript and copy of the exhibits are enclosed.


Signed:

_Deborah M. Gaines_                    5-13-02
Deborah M. Gaines                      _____
Hearing Officer                        Date

Cc: R. Prone
    W. Rae
    M. O'Connell

BASED ON THE FINDINGS OF THE HEARING OFFICER IN THIS CASE, AND
IN CONSIDERATION OF THE SERIOUS NATURE OF THE PROVEN
OFFENSE, I HEREBY ASSESS THE FOLLOWING DISCIPLINE:

### DISMISSAL IN ALL CAPACITIES
### EFFECTIVE IMMEDIATELY

Please return any and all items of Company property,
Including your Rail Travel Privilege Pass, to this office
as soon as possible.

Francis J. O'Connor Jr.
Assistant General Manager
Commuter Operations
253 Summer Street
Boston, MA 02210

# EMPLOYEE
# EXHIBIT
# "D"



# Brotherhood of Locomotive Engineers
## General Committee of Adjustment
### AMTRAK

Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, NJ 08002
Telephone (856) 488-7432
Fax (856) 488-7434

**Mark B. Kenny**
*General Chairman*

May 29, 2002

Mr. Larry C. Hriczak
Director - Labor Relations
National Railroad Passenger Corporation
30th Street Station
2nd Floor. South Tower
Philadelphia. PA 19104

RE: Expedited Handling
01-049
Claimant: J. T. Carmack

Dear Mr. Hriczak:

In accordance with the provisions of Rule 21 paragraph k., of the Agreement between the Brotherhood of Locomotive Engineers and the National Railroad Passenger Corporation. this will serve as appeal of the Carrier's denial of the above-captioned claim. Kindly docket this case for discussion as per the rule.

Respectfully.

Mark B. Kenny
General Chairman

MBK:sec
cc: R. S. Prone, LC Division 312



*Serving Since 1863*

# EMPLOYEE
# EXHIBIT
# "E"

**NATIONAL RAILROAD PASSENGER CORPORATION**
30th Street Station, Philadelphia, PA 19104



AUG 3 0 2002



August 28, 2002

Mr. Mark B. Kenny, General Chairman
Brotherhood of Locomotive Engineers
Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, New Jersey 08002


RE:   OC-BLE-SD-1418D
      J. T. Carmack

Dear Mr. Kenny:

This refers to the above-captioned case which was discussed on August 8, 2002, and for which
the time limits for response were extended by mutual agreement. By letter dated September 10,
2001, Passenger Engineer J. T. Carmack., Claimant, headquartered in Work Zone CS-1 at
Boston, MA, was charged with the following:


**Charge I:**      Development of the facts and determination of your responsibility, if any, in that
on August 27, 2001, at 4:00 P.M., you failed to appear for a fitness for duty
evaluation with Dr. Vasile. In a letter dated July 24, 2001, you were instructed by
Mr. O'Malley, Director of Operations, that "your failure to appear, your refusal to
cooperate with the physician, or adopt some other tactic to frustrate this
evaluation would initiate the formal discipline process for gross insubordination."

Your alleged failure to comply with this directive constitutes a direct violation of
Amtrak's 'Standard of Excellence', under the section titled 'Professional and
Personal Conduct', specifically Teamwork, which reads in pertinent part:

"[F]ollowing instructions...you must comply with all company and departmental
policies, procedures and rules as well as all instructions, directions and orders from
supervisors and managers."


The investigation was originally scheduled to be held on September 17, 2001, and was postponed
by the Union, commenced on April 4, 2002 and continued on April 23 and 24, 2002 and
concluded on May 7, 2002. Claimant was in attendance throughout the investigation and was
represented by a duly accredited representative of the Organization. Both reviewed evidence and

Mr. Mark B. Kenny                    2                     August 28, 2002
OC-BLE-SD-1418D
J. T. Carmack

questioned witnesses.  By Decision Letter dated May 13, 2002, Claimant was advised that, based
on substantive evidence of probative value, the testimony and documentation presented in the
investigation, the charge was proven and Claimant was dismissed

By letter dated May 29, 2002, the Organization requested an expedited appeal to the highest
officer of the Corporation designated to handle such matters, the Director-Labor Relations.

In conference, the Organization took many exceptions.  Procedural exception was taken to the
time limit of the charge, the Standards of Excellence is not a rule as contemplated by Rule 21 and
Rule 25 was not properly applied.  It was also asserted that the whole matter was something
engineered by the Manager Labor Relations in his TART team role.  Also, it was the
Organization's position that Dr. Pinsky was only provided a select portion of the documents
upon which to base his decisions.  Further, once medically disqualifying Claimant, Claimant had a
right to a third party Board of doctors.   Finally, the Organization takes the position that the
charge was not proven and the discipline is excessive.

The Organization also asserted violations of the Taft-Hartley Law and U.S.C. 29§141-Note 16,
violations of the Railway Labor Act in interfering with Union activities, violation of the civil rights
of the accused and a violation of Freedom of Speech.  The Organization was informed that any
such assertions are made in the wrong forum.

A review of the transcript supports the findings of the Hearing Officer.  It was evident through the
testimony of Director of Commuter Operations M. O'Malley, that Claimant was dutifully
instructed to attend and participate in a Fitness for Duty physical.  Claimant despite his attempts
to frustrate the process, was directed to participate in a fitness for duty physical as arranged by
Amtrak's Chief Medical Officer (C.M.O.)  Claimant asserted that he was unwilling to sign a
standard release so that the results of the exam could be reported back to Amtrak.  Claimant was
unwilling to do so for his own unspecified reasons other than his assertion that, to do so, would
cause him harm..  The Organization attempted to utilize that unfounded assertion as the basis of
Claimant's refusal under the Standard of Excellence exception where compliance would create a
clear, immediate danger to Claimant.

Despite the length of this hearing and its many twists and straw men created by the representative
of the Organization and the Claimant, this is a simple case of gross insubordination.  Claimant
was given an instruction.  Claimant failed to fulfil the instructions.  To avoid any confusion, the
instruction was given in a more explicit manner and Claimant was advised of the ramification of
non-compliance.  Claimant chose not to comply.

There are no procedural defects in this case.  The charge, as stated by the Hearing Officer in the
decision letter, was properly brought within the time limits of Rule 21.     Further, the

Mr. Mark B. Kenny           3                                 August 28, 2002
OC-BLE-SD-1418D
J. T. Carmack

organization's reliance on Rule 25 is totally misplaced as Rule 25 was not applicable. The purpose of Rule 25 is to reconcile a difference in medical diagnosis. In this case, Claimant constantly sought to frustrate the process of Amtrak's obtaining an initial evaluation. Such activity is inconsistent with compliance of the direct order given by the Director Commuter Operations O'Malley. Claimant was insubordinate.

Claimant asserted that he met with the Doctor as instructed. Further, he rescheduled his exam with the Doctor as instructed. His only fault, according to Claimant, was in not allowing the Doctor to perform an evaluation. Such a minimalization is truly disingenuous. This case was one of complete defiance of authority by the Claimant and his attempts to sharp-shoot the instructions given for a fitness for duty exam.

The charge was proven through the testimony of Director of Commuter Operations O'Malley (commencing at page 8), who testified that he gave instructions to Claimant to undergo a fitness for duty exam. Director O'Malley's testimony (page 34) shows that Claimant was provided a direct order to attend and cooperate in an exam and advised him of the ramifications of his failure to do so. Further, Claimant was advised that such a failure would be categorized as gross insubordination (Exhibit M).

The testimony of Amtrak's C.M.O., Dr. T. Pinsky, shows that he was concerned with materials sent from Occupational Health Nurse Letterio. These materials were forwarded to her by L. DePhillips, a member of the Boston, MA, TART team. Dr. Pinsky reviewed the matter and took a more restrictive approach than that recommended by TART team representative DePhillips. Based on his medical review as C.M.O., Dr. Pinsky ordered Claimant medically disqualified from duty pending a fitness for duty exam. Further, despite the Organization's continued assertion to the contrary, Dr. Pinsky testified that he obtained and reviewed the complete package of documents within days of his decision to direct a fitness for duty physical for Claimant (page 129). Dr. Pinsky advised Director O'Malley that Claimant was medically disqualified pending the exam.

Each officer of Amtrak testified that there was a discrete basis for the actions taken based on Corporate policy and procedure.

General Road Foreman G. DeModena testified that he came into possession of documents which portrayed him as a character in a parody of a play. Further, there was a notation by Claimant that he found this play more to his liking due to the messy ending wherein the character assigned to DeModena was assassinated. Foreman DeModena, in accord with PERS-42, properly reported what he perceived to be a threat against his person. In addition another character in the parody likewise assassinated was assigned to Local Chairman M. O'Bryan, Claimant's union representative, with whom Claimant was having a dispute. General Road Foreman DeModena, in

Mr. Mark B. Kenny                              4                        August 28, 2002
OC-BLE-SD-1418D
J. T. Carmack


accord with Amtrak's PERS-42, promptly notified Local Chairman O'Bryan. While the union
officer "blew off" the threat nature, General Road Foreman DeModena did not. DeModena
notified a member of the New England Division, Threat Assessment and Response Team (TART),
L. DePhillips. TART member DePhillips, Manager, Labor Relations, seriously investigated the
compliant and made his recommendations to Dr. Pinsky. DePhillips also reviewed the complaint
with his other TART team members, S. Allen, Manager, Human Resources (page 237) and R.
Smith, Captain, Amtrak Police Department (page 159), who concurred with his
recommendations. Captain Smith further testified that if an employee perceives a threat he must
act in good faith (page 146) and if perceived as a threat, it is treated as a threat (page 151).

The Organization continually attempted to downplay the nature of this case, totally ignoring
Amtrak's medical concerns, in their attempt to justify Claimant's refusal to comply with a direct
order. The Organization seeks conspiracy and ulterior motives of other to justify Claimant's
gross insubordination. Further, the correspondence is alleged to have been due to internal union
conflict. The alleged internecine nature of the parody was asserted to be done for effect - only
words.

However, the bottom line was that Claimant refused to comply with the direct order of Director
O'Malley. Claimant refused to sign a waiver of confidentiality (pages 416 - 420) so that the
exam results could be reported back to Amtrak's Medical Department. Further, Claimant's
characterization of his interaction with Dr. Vasili is refuted in the notarized letter dated April 2,
2002, from Dr. Vasili (Exhibit Q). As properly found by the Hearing Officer, the only reason no
Fitness for Duty Exam was performed was Claimant's refusal to participate. Further, such a
refusal is not consistent with the exception listed under the Standard of Excellence.

Having proven the charge, one turns to the discipline assessed. Insubordination was proven and is
a charge for which dismissal is entirely appropriate. Based on the seriousness of the infraction
and the fact Claimant was aware of the potential consequences of his decision, discipline of
dismissal was not arbitrary, capricious nor excessive, but was fully warranted.

Based on the foregoing and the reasons stated in previous correspondence, which are
incorporated herein by reference, the appeal is denied.


Very truly yours,


Larry C. Hriczak
Director-Labor Relations

# EMPLOYEE
# EXHIBIT
# "F"



# Brotherhood of Locomotive Engineers
## General Committee of Adjustment
### AMTRAK

Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, NJ 08002
Telephone (856) 488-7432
Fax (856) 488-7434

**Mark B. Kenny**
*General Chairman*

September 4, 2002

Mr. Larry C. Hriczak
Director - Labor Relations
National Railroad Passenger Corporation
30th Street Station
2nd Floor, SouthTower
Philadelphia, PA 19104

RE: OC-BLE-SD-1418D
Claimant: J. T. Carmack

Dear Mr. Hriczak:

In accordance with the provisions of Rule 21 paragraph k (4), of the Agreement between the Brotherhood of Locomotive Engineers and the National Railroad Passenger Corporation, this is to advise that your negative decision in the above-captioned matter is rejected as a final disposition of this case.

Respectfully,

*Mark B. Kenny*

Mark B. Kenny
General Chairman

MBK:sec
cc: R. S. Prone, LC Division 312



Serving Since 1863



# Brotherhood of Locomotive Engineers
### General Committee of Adjustment
### AMTRAK

Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, NJ 08002
Telephone (856) 488-7432
Fax (856) 488-7434

**Mark B. Kenny**
*General Chairman*

September 4, 2002

Mr. Larry C. Hriczak
Director - Labor Relations
National Railroad Passenger Corporation
30th Street Station
2nd Floor, South Tower
Philadelphia, PA  19104

RE:  OC-BLE-SD-1418D
Claimant: J. T. Carmack

Dear Mr. Hriczak:

In accordance with the provisions of Rule 21 paragraph k (4), of the Agreement between the Brotherhood of Locomotive Engineers and the National Railroad Passenger Corporation, this will serve as appeal of the Carrier's denial of the above-captioned claim.  Kindly list this case for submission to the Board.

Respectfully,

*Mark B. Kenny*

Mark B. Kenny
General Chairman

MBKsec
cc:  R. S. Prone, LC Division 312



*Serving Since 1863*

NATIONAL RAILROAD PASSENGER CORPORATION

30th Street Station, Philadelphia, PA 19104



September 5, 2002

Mr. Roland Watkins
Director – Arbitration Services
National Mediation Board
1301 "K" Street, NW
Suite 250 E
Washington, DC  20572-0002

**RE:**    **Special Board of Adjustment 928**
**Amtrak – Brotherhood of Locomotive Engineers**

Dear Mr. Watkins:

Amtrak and the Brotherhood of Locomotive Engineers agree to list the following case(s) to be heard by the above board:

| NMB Case No. | Amtrak Case No. | Claimant | Subject Code |
|---|---|---|---|
| 379 | OC-BLE-SD-1374 | D. L. McCreary | 117 |
| 380 | NEC-BLE-SD-4650D | Robert Asselin | 24 |
| 381 | NEC-BLE-SD-467D | D. J. Friel, Jr. | 106 |
| 382 | OC-BLE-SD-1418D | J. T. Carmack | 119 |

Please advise if the foregoing meets with your approval.

Very truly yours,

*Larry C. Hriczak*

Larry C. Hriczak
*Director – Labor Relations*

cc:    Martin Malin
       Mark Kenny

NATIONAL RAILROAD PASSENGER CORPORATION

30th Street Station, Philadelphia, PA 19104

SEP – 9 2002

AMTRAK

NATIONAL MEDIATION BOARD

2002 SEP –5  A 10: 00

September 5, 2002

Mr. Roland Watkins
Director – Arbitration Services
National Mediation Board
1301 "K" Street, NW
Suite 250 E
Washington, DC  20572-0002

RE:    Special Board of Adjustment 928
       Amtrak – Brotherhood of Locomotive Engineers

Dear Mr. Watkins:

Amtrak and the Brotherhood of Locomotive Engineers agree to list the following case(s) to be heard by the above board:

| NMB Case No. | Amtrak Case No. | Claimant | Subject Code |
|---|---|---|---|
| 379 | OC-BLE-SD-1374 | D. L. McCreary | 117 |
| 380 | NEC-BLE-SD-4650D | Robert Asselin | 24 |
| 381 | NEC-BLE-SD-467D | D. J. Friel, Jr. | 106 |
| 382 | OC-BLE-SD-1418D | J. T. Carmack | 119 |

Please advise if the foregoing meets with your approval.

Very truly yours,

Larry C Hriczak

Larry C. Hriczak
Director – Labor Relations

cc:    Martin Malin
       Mark Kenny

THE ___4___ CASE(S) IS/ARE ADDED TO THIS BOARD.
NEUTRAL IS AUTHORIZED TO HANDLE THE CASE(S)
AS SUPPLEMENT TO DOCKET LISTED IN APPOINTMENT
LETTER.

Roland Watkins

ROLAND WATKINS
DIRECTOR, ARBITRATION SERVICES

SEP 5 – 2002

# EMPLOYEE
# EXHIBIT
# "G"

notification, the claim will become invalid unless, within one year from the date of the Corporation's decision, the claims are disposed of on the property or submitted to a tribunal having jurisdiction pursuant to law or agreement, unless the parties mutually agree to other proceedings for final disposition of said claims.

i.  The time limit provisions in this Rule may be extended at any level of handling in any particular case by mutual consent of the duly authorized officer of the Corporation or representative of the Organization.

j.  The time limits set forth herein do not apply in discipline cases.

### RULE 21

### DISCIPLINE AND INVESTIGATION

a.  Except as provided in paragraph "c," no Passenger Engineer will be disciplined, suspended or dismissed from the service until a fair and impartial formal investigation has been conducted by an authorized Corporation officer.

b.  1.  Except when a serious act or occurrence is involved, a Passenger Engineer will not be held out of service in disciplinary matters before a formal investigation is conducted.  A serious act or occurrence is defined as:  Rule "G." Insubordination, Extreme Negligence, Stealing.

- 30 -

2.   If a Passenger Engineer is held out of service before a formal investigation for other than a serious act or occurrence, he will be paid what he would have earned on his assignment had he not been held out of service beginning with the day he is taken out of service and ending with the date the decision is rendered or he is returned to service, excluding the day of the formal investigation, whether or not he is disciplined. Holding a Passenger Engineer out of service before a formal investigation or paying him for being out of service for less than a serious act or occurrence is not prejudging him.

c.   Formal investigations, except those involving a serious act or occurrence, may be dispensed with should the Passenger Engineer involved and/or the duly accredited representative and an authorized officer of the Corporation, through informal handling, be able to resolve the matter to their mutual interests. Requests for informal handling must be made at least 24 hours before a formal investigation is schedule to begin. No formal transcript, statement or recording will be taken at the informal handling. When a case is handled informally and the matter of responsibility and discipline to be assessed, if any, is resolved, no formal investigation will be

- 31 -

required.  A written notice of the discipline assessed and
the reason therefor will be issued to the Passenger
Engineer responsible, with a copy to the duly accredited
representative if he participated in the informal handling,
at the conclusion of the informal handling.  Discipline
matters resolved in accordance with this paragraph are
final and binding.

    d.  1.  A Passenger Engineer directed to attend a
formal investigation to determine his responsibility, if
any, in connection with an act or occurrence will be
notified in writing within seven days from the date of the
act or occurrence or in cases involving stealing or
criminal offense within seven days from the date the
Corporation becomes aware of such act or occurrence.  The
notice will contain:

    A.  The time, date and location where the
formal investigation will be held.

    B.  The date, approximate time and the
location of the act or occurrence.

    C.  A description of the act or occurrence
which is the subject of the investigation
and rules which may be involved.

    D.  A statement that he may be represented
by his duly accredited representative.

- 32 -

E.  The identity of witnesses directed by
the Corporation to attend.

2.  When a letter of complaint against a
Passenger Engineer is the basis for requiring him to attend
the formal investigation, the Passenger Engineer will be
furnished a copy of the written complaint together with the
written notice for him to attend the investigation.

e.  1.  The investigation must be scheduled to
begin within seven days from the date the Passenger
Engineer received notice of the investigation.

2.  A Passenger Engineer who may be subject to
discipline will have the right to have present desired
witnesses who have knowledge of the act or occurrence, to
present testimony, and the Corporation will order employee
witnesses to be in attendance.

3.  The time limit is subject to the
availability of the principal(s) involved and witness(es)
to attend the formal investigation and may, by written
notice to the Passenger Engineer involved, be extended by
the equivalent amount of time the principal(s) involved or
necessary witness(es) are off duty due to sickness,
temporary disability, discipline, leave of absence or
vacation.

When a Passenger Engineer is being held out of service for a serious act or occurrence pending the investigation and other principal(s) or witness(es) are not available for the reasons cited, he may request commencement of the investigation. If either the Passenger Engineer or the Corporation officer is of the opinion that the testimony of the unavailable principal(s) or witness(es) is necessary for the final determination of the facts and discipline has been assessed against the Passenger Engineer as a result of the investigation, such discipline will be reviewed when the testimony of the missing principal(s) or witness(es) is available.

4. When a formal investigation is not scheduled to begin within the time limit as set forth in this Rule, no discipline will be assessed against the Passenger Engineer.

5. A Passenger Engineer who may be subject to discipline and his duly accredited representative will have the right to be present during the entire investigation. Witnesses may be examined separately but those whose testimony conflicts will be brought together.

f. When a Passenger Engineer is assessed discipline, a true copy of the investigation record will be given to the Passenger Engineer and to his duly accredited representative with the notice of discipline.

- 34 -

g.   1.   If discipline is to be imposed following a formal investigation, the Passenger Engineer to be disciplined will be given a written notice of the decision within 10 days of the date the formal investigation is completed, and at least 15 days prior to the date on which the discipline is to become effective, except that in cases involving serious acts or occurrences, discipline may be effective at any time.

2.   When a Passenger Engineer is required to perform service during a period of suspension, the balance of said suspension will be eliminated.

h.   1.   When a Passenger Engineer or his duly accredited representative considers the discipline imposed unjust and has appealed the case in writing to the Labor Relations officer having jurisdiction within 15 days of the date the Passenger Engineer is notified of the discipline, the Passenger Engineer will be given an appeal hearing. Dismissal cases involving claims for time lost will be handled in accordance with the provisions of paragraph "k."

2.   The hearing on an appeal, if requested, will be granted within 15 days of the Labor Relations officer's receipt of the request for an appeal hearing.

3.   Except when discipline assessed is dismissal, or when a Passenger Engineer has been held out

- 35 -

of service under paragraph "b" and assessed discipline, this appeal will act as a stay in imposing the discipline until after the Passenger Engineer has been given an appeal hearing.

4.  At appeal hearings, a Passenger Engineer may, if he desires to be represented at such hearings, be accompanied by his duly accredited representative.

5.  The Labor Relations officer having jurisdiction will advise the Passenger Engineer of the decision, in writing at the conclusion of the appeal hearing, with a copy to the duly accredited representative.  If the decision is to the effect that the discipline will be imposed, either in whole or for a reduced period, the stay referred to in paragraph "h3" will be lifted, and the discipline will be effective on the day following the day of the appeal hearing.

i.  If a decision rendered by the Labor Relations officer is to be appealed, the General Chairman must, within 60 days after the date the decision is rendered by the Labor Relations officer, make an appeal in writing to the highest appeals officer of the Corporation requesting either that he be given a written response or that the case be held in abeyance pending discussion in conference with the highest appeals officer of the Corporation.  When a

- 36 -

written response is requested, the highest appeals officer of the Corporation will give written notification of his decision to the General Chairman within 60 days after the date of his receipt of the appeal. When a request is made for the case to be held in abeyance pending discussion in conference, the conference will be arranged within 60 days after the highest officer of the Corporation receives the request for a conference. The highest appeals officer of the Corporation will give written notification of his decision to the General Chairman within 60 days after the date of the conference.

j. The decision of the highest appeals officer of the Corporation will be final and binding unless, within 60 days after the date of the written decision, that officer is notified in writing that his decision is not accepted. In the event of such notification, the decision on a case involving other than dismissal is still final and binding, unless the case is submitted to a tribunal having jurisdiction pursuant to law within one year computed from the date the decision was rendered.

k. Expedited Procedure for Handling Dismissal Cases.

1. When a Passenger Engineer is dismissed, his case may be given expedited handling by his General

- 37 -

Chairman to a Special Board of Adjustment, which will meet
in Philadelphia, PA, and be composed of three members:

   A.  A representative of the Brotherhood of
     Locomotive Engineers.

   B.  The highest appeals officer of the
     Corporation or his designated repre-
     sentative.

   C.  A neutral member selected by the
     parties.

   In the event the parties are unable to agree
upon a neutral member, they will request the National
Mediation Board to appoint a neutral.  Such Special Board
will be established pursuant to Public Law 89-456 89th
Congress, H. R. 706 June 20, 1966, within 30 days of the
effective date of this Agreement.

   2.  Before invoking the services of the
Special Board of Adjustment, the General Chairman must,
within 30 days after the date of a notice of dismissal,
appeal the case in writing directly to the highest appeals
officer of the Corporation.

   3.  In the written appeal, the General
Chairman should either request a conference or waive the
conference and request a written decision.  When a
conference is requested, a meeting date will be arranged as

promptly as possible but not later than 30 days after the
highest appeals officer of the Corporation receives the
request.  The highest appeals officer will render a
decision in writing to the General Chairman as promptly as
possible, but not later than 15 days after the date the
case is discussed in conference.  When a written decision
is requested, the highest appeals officer of the
Corporation will render a decision in writing to the
General Chairman as promptly as possible, but not later
than 30 days after the date the appeal is received.

    4.  The decision of the highest appeals
officer of the Corporation will be final and binding
unless, within 30 days after the date the General Chairman
receives the decision, the General Chairman notifies the
highest appeals officer of the Corporation in writing of
his desire to submit the case to the Special Board of
Adjustment.  After the highest appeals officer of the
Corporation receives such notification, the Board will be
convened as promptly as possible.  The Board will render a
final and binding decision as promptly as possible, but not
later than 30 days after the case is presented before the
Board.

    5.  Claim for time lost will be waived in any
dismissal case which the Organization does not progress

- 39 -

under the Expedited Procedure for Handling Dismissal
Cases. This will not preclude the Organization from
progressing such a case to a tribunal having jurisdiction
pursuant to law without regard to any time limits in this
Rule. The progression of such a case will not be
considered a request for leniency.

    1. 1. Time limits provided for in this Rule may
be extended or waived by agreement in writing between the
applicable officer of the Corporation and the Passenger
Engineer's General Chairman or duly accredited
representative.

    2. If discipline assessed is not appealed
within the time limits set forth in this Rule or as
extended, the decision will be considered final, except as
provided in paragraph "k5." If the decision on the appeal
is not rendered within the time limits set forth in this
Rule or as extended, the discipline assessed will be
expunged.

    m. When notification in writing is required,
personal delivery or proof of mailing within the specific
time limit will be considered proper notification.

- 40 -

Exhibit __H__

Gaines:    You have.

Pinsky:    Should I go ahead and answer the question Ms. Gaines?

Gaines:    Yes, you may, go ahead Dr. Pinsky.

Pinsky:    The five pages that I was provided with initially on about May 3rd were so alarming and of such concern that any reasonable physician or any reasonable layperson would have deemed them appropriate to medically disqualify Mr. Carmack at that moment, which is what I did.

Prone:    Why, what did you find alarming about them?

Pinsky:    Okay. Well when someone identifies themselves as Lucifer, the Prince of Darkness, identifies documentation in a workplace as Letters from Hell, and those are just a couple of examples. I'll give you another one, all answers should be sent to Institute of Devastation Awareness, these are all very concerning types of of documentation as to whether or not this individual has a severe psychiatric disorder that presents a threat to not only his co-workers but to himself and the traveling public. I'm talking about such things as personality disorder, bi-polar disorder, etc.

Prone:    Yet you felt you felt comfortable with making this decision even today? When you realized there were you received only one tenth of the entire package?

Pinsky:    I'm comfortable with all the decisions I've made in this case including that one.

Prone:    Are you comfortable with your adherence to the BLE agreement? Rule 25?

Pinsky:    I don't see the relevance of that, but I think I've always abided by Amtrak policies.

Prone:    Do you feel that you were ever instructed on Rule 25 by any official of the carrier?

Pinsky:    As far as I know Rule 25 has not been a part of Mr. Carmack's case or my involvement with it. I've never received any type of request for a third opinion, if that's what you're referring to.

Prone:    Are you bound by the contract Dr. Pinsky?

Exhibit __I__

# NATIONAL RAILROAD PASSENGER CORPORATION
## AMTRAK HEALTH SERVICES

### INTEROFFICE MEMORANDUM

Date:  5/7/01

To: Marianne Letterio, BSN, COHN, Manager Health Services

From:  Tim Pinsky, D.O., M.P.H., Medical Director/NEC

RE: Joseph Carmack

SS#: 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

Per his request, I spoke with Mike O'Bryan, union representative, on behalf of Mr. Carmack.  Mr. O'Bryan stated that I had only been provided with some of the documents pertaining to Mr. Carmack in arriving at my decision rendered late last week.  He went on to say that he disagreed with the decision to render this employee "medically disqualified," pending a psychiatric fitness for duty exam.  By way of explanation, he stated that the actual documentation was about 40 pages rather than five.  The other pages included correspondence between various parties, including Mr. O'Bryan and Mr. O'Malley, general manager.  The subject of some of these letters was disciplinary and attendance issues on Mr. Carmack's part.  Mr. O'Bryan said that he had been butting heads with Mr. Carmack for the last several months over these issues despite the fact that Mr. O'Bryan had lobbied in Mr. Carmack's behalf to reduce the severity of disciplinary measures.  He wrote an eight-page letter to Mr. Carmack explaining this on 3/11/01 but Mr. Carmack took issue with Mr. O'Bryan's representation.  In response to this dissatisfaction, Mr. Carmack authored the "Letters From Hell."

Mr. O'Bryan reported that although he doesn't like Mr. Carmack, he does not feel that he is a threat to himself, to co-workers, or the traveling public.  He believes that there is no indication for a fitness for duty exam and that Mr. Carmack is being treated inequitably and unfairly.  Mr. O'Bryan went on to say that Mr. Carmack and other employees refer to him as "God," so there is nothing unusual in Mr. Carmack writing a letter to God since, according to Mr. O'Bryan, he was actually writing a letter to him.  Mr. O'Bryan's impression of Mr. Carmack is that he is highly intelligent, perhaps avant-garde, but difficult to get along with.  Overall, Mr. O'Bryan feels that certain members of the TART team are using me.

I discussed the issues in this case with Mr. O'Bryan. I explained that there was ample written documentation to warrant that Mr. Carmack be medically disqualified pending a fitness for duty exam. The content of his writings raised the index of suspicion of an underlying psychiatric disorder to the level where a psychiatric evaluation is appropriate. I also advised him that the remaining documentation was on the way for my review and that I would peruse this upon receipt. I pointed out that Mr. O'Bryan was one of the characters in the "play" written by Mr. Carmack that was noted to be "dead." This implication, along with the other notations authored by Mr. Carmack (e.g.- signing off as "Lucifer," "Prince of Darkness," requesting responses be sent to "Institute of Devastation Awareness"), convince me that it is in everyone's best interest that Mr. Carmack be evaluated for fitness for duty.

Exhibit __J__

Gaines:    Okay, and and that, and again

O'Bryan:    That's alright.

Gaines:    and not from the letter you had it.

O'Bryan:    Yes maam.

Gaines:    That's hearsay, you have direct knowledge.  So you had it in your hands

O'Bryan:    I did.

Gaines:    And when?

O'Bryan:    October, I'd say October of 2000 give or take a couple of weeks.

Gaines:    Okay.

Prone:    And Mr. when did Mr. DeModena file his TART complaint?  About the play?

O'Bryan:    April, 2001, May possibly?  I believe April.

Prone:    Thank you.  Mr. O'Bryan, do we have a diversity program in this company?

O'Bryan:    Yes we do.

Prone:    Can you explain what diversity is?  Amtrak's diversity program.

Gaines:    Can we go off record for one second?  Okay back on the record.

Prone:    I don't have any questions at this time.

Gaines:    Okay, do you have some more Mr. Carmack?

Carmack:    On a meeting at the that you went with me to see Dr. Bassilli, now I discussed with Dr. Bassilli and some of this is in the record about a basis for disqualification and whether or not the a an examination was appropriate, do you remember that?

O'Bryan:    Yes I do.

Carmack:    And wasn't it at that point that he said he could not do his job?

O'Bryan: Dr. Dr. Bassilli said that he could not do his job without knowing all the facts, without having cooperation, having all the documents, knowing what everything was about. That was, that was very close if not, it was clearly intent of what he was saying in my opinion.

Carmack: That's good. That's all I have.

Gaines: Okay. Thank you and you have something?

Prone: I just have one more question along that line. Was Dr. Bassilli ever furnished any material by Dr. Pinsky?

O'Bryan: Dr. Bassilli was asked that question by either myself or Mr. Carmack but we were both there at the time and a matter of fact I believe I asked him that question; and he said yes he had been furnished material by Dr. Pinsky. In fact I I and I asked him did Dr. could he tell us or would he be willing to tell us what you what Dr. Pinsky provided you with, and he said yeah I have this and it was either four or six pages, which consisted of the letters from hell cover page, the Godzilla cartoon, the recasting of Hamlet and possibly something else. Then I asked him

Prone: That's all I wanted to know.

Gaines: Okay, and this was you testified to this the last time you were here.

O'Bryan: Okay.

Gaines: Any further cross, Mr. Rae?

Rae: No.

Gaines: Thank you.

O'Bryan: Thank you.

Gaines: Alright.

Prone: Did you, how many pages did you receive from Mr. DePhillips to base your medical disqualification on?

Pinsky: Talking about the original material from from our last conversation?

Gaines: Yes.

Prone: Yes.

Exhibit __K__

**RUSSELL G. VASILE, M.D.**
Diplomate, American Board of Psychiatry and Neurology
25 BAY STATE ROAD
BOSTON, MASSACHUSETTS 02215

TELEPHONE (617) 437-9566

RECEIVED

JUL 19 2001

AMTRAK MEDICAL RECORDS
PHILADELPHIA, PA 19104

July 16, 2001

Dr. Tim Pinsky
Medical Director/NEC
Amtrak Health Services, Mailbox 67
30th Street Station
Philadelphia, PA 19104

Dear Dr. Pinsky,

Mr. Joseph Carmack presented to my office on June 27, 2001 with his union representative Mr. Michael J. O'Bryan. He declined to participate in a formal psychiatric evaluation. I explained that this evaluation would include a comprehensive psychiatric history, mental status exam and psychological testing performed by a clinical psychologist. Please let me know if I can be of any further assistance.

Sincerely,

Russell G. Vasile MD

Exhibit L

ANNE GURIAN, M. D.
7 STANDISH STREET
CAMBRIDGE, MASSACHUSETTS 02138

Telephone 864-3667

May 30, 2001

To whom it may concern:

Mr. Joseph Carmack has been treated by me. On January 18, 2001, he became able to return to work and he continues to be so.

I agree with Mr. Carmack that a forced, nonconfidential psychiatric consultation would be inadvisable for medical reasons.

Sincerely yours,

Exhibit __M__

RUSSELL G. VASILE. M.D.
DIPLOMATE, AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
25 BAY STATE ROAD
BOSTON. MASSACHUSETTS 02215
—
TELEPHONE (617) 437-9566

April 2, 2002

Mr. Michael J. O'Malley
Director of Operations
Amtrak-Commuter Rail
89 Canal Street
Boston, MA 02114

Dear Mr. O'Malley,

At your request, I am responding to your letter of April 2, 2002 in which you presented issues raised by Mr. Joseph T. Carmack related to my interaction with him regarding the attempt to conduct a formal psychiatric evaluation in June of 2001. I should like to respond to each of Mr. Carmack's statements that you presented in your communication to me, following the Roman numeral ordering of your letter.

I.     I do recall Mr. Carmack indicating to me that he knew of no medical basis for the appointment and that he thought it would be inappropriate to undergo an examination. He did explain circumstances and issues related to the documents he had written. I did not tell Mr. Carmack that I would suggest to Amtrak that the company find another solution than requiring an evaluation session. I described the elements of a psychiatric evaluation to Mr. Carmack, including obtaining a detailed medical and psychiatric history and obtaining psychological testing. I indicated that such an evaluation could not occur without his willing cooperation.

II.    Mr. Carmack presented to my office on June 27,2001 with Mr. O'Bryan. I indicated to Mr. Carmack that I could not make a determination of a basis for medical disqualification or assess whether he posed a threat to the health and safety of others without conducting a full psychiatric evaluation including psychological testing. I did not advise Mr. Carmack that the Workplace Violence report was neither a basis for medical disqualification or evidence that Mr. Carmack poses a direct threat to the health and safety of others. I did state that the evidence in the Workplace Violence report needed to be placed in the context of a comprehensive psychiatric evaluation before any assessment of fitness for duty could be made.

III.    Mr. Carmack inplies that "Psychotherapist-Patient Privilege" was violated by Amtrak ordering the evaluation.  This is incorrect. I was not in the role of Mr. Carmack's

psychotherapist and informed him that as an evaluator employed by Amtrak, any issues we discussed were not confidential and could be included in my report to Dr. Pinsky. Psychotherapist – Patient confidentiality is not pertinent here because I am not acting as Mr. Carmack's personal treating psychiatrist. I clearly informed him of the fact that our communication was not confidential. This waiver of confidentiality in forensic psychiatry is known as the Lamb warning.

IV.    During our meeting of June 27, 2001, Mr. Carmack did express his concerns regarding illegal disqualification, breach of confidentiality and illegal examination. I did not agree to mediate as a neutral and advise Amtrak that an alternative solution could be reached. I did express regret that we were at an impasse and that possibly a psychiatric evaluation could occur in the future once Mr. Carmack's issues with Amtrak were resolved.

V.    In telephone conversations with Mr. Carmack, I reiterated to him that the psychiatric evaluation I was asked to conduct would not be confidential. Mr. Carmack expressed reluctance to submit to a psychiatric evaluation if such evaluation were not confidential. I indicated that I did not wish to proceed given his concerns. I did indicate that if he had a change of heart it might be appropriate to have him review and sign a formal waiver of confidentiality to assure that there was no misunderstanding of the lack of confidentiality in this evaluation. It became clear Mr. Carmack did not wish to pursue the evaluation. I indicated that signing a waiver of confidentiality was not pertinent, as he clearly did not wish to proceed with an evaluation that would not be confidential.

I do not recall Mr. Carmack stating that he was "submitting to the evaluation under protest". A valid psychiatric evaluation cannot occur when an individual is in a state of protest and not collaborating with the evaluation. I did not opt out of my contract with Amtrak. I indicated to Dr. Pinsky that I could not conduct a psychiatric evaluation without Mr. Carmack's cooperation. I did not have a formal contract with Amtrak. I simply agreed to conduct a psychiatric evaluation. The notion that "Dr. Vasile was in a dilemma" is invalid. I absolutely have no legal responsibility against breach of confidentiality and no responsibility against an illegal medical examination. I clearly informed Mr. Carmack repeatedly that the evaluation was outside of psychotherapist – patient confidentiality as is the clear legal standard in independent medical psychiatric evaluations. Further, it is absurd to imply that an independent medical examination freely agreed to by the evaluator and patient is "illegal". I did indicate to Mr. Carmack that perhaps he and Amtrak could agree to pursue the psychiatric evaluation through another psychiatrist. I wrote a letter to Dr. Pinsky dated July 16, 2001 in which I indicated that Mr. Carmack presented to my office with Mr. O'Bryan and that Mr. Carmack declined to participate in a formal psychiatric evaluation. A copy of the letter is enclosed along with a copy of a letter indicating Mr. Carmack's cancellation of a previously scheduled appointment.

Sincerely,

Russell G. Vasile MD

THEN PERSONALLY APPEARED THE ABOVE-NAMED RUSSELL G. VASILE, M.D., AND BEING OF SOUND MIND, AND SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY, THAT THE STATEMENTS CONTAINED WITHIN SAID DOCUMENT ARE TRUE AND ACCURATE, AND SIGNED AND SWORN TO, THIS THIRD DAY OF APRIL, IN THE YEAR OF OUR LORD, TWO THOUSAND AND TWO.

Sonya B. Martin
NOTARY PUBLIC
June 28, 2002
MY COMMISSION EXPIRES: 6.28.02

Exhibit **N**

**RUSSELL G. VASILE, M.D.**
DIPLOMATE, AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
25 BAY STATE ROAD
BOSTON, MASSACHUSETTS 02215

TELEPHONE (617) 437-9566

August 28, 2001

Dr. Tim Pinsky
Amtrak Medical Director/NEC
30th Street Station- Box 67
Philadelphia, PA 19104

Dear Dr. Pinsky,

I am writing to indicate that Mr. Joseph Carmack and I negotiated an appointment date of August 27th at 4 PM for a psychiatric evaluation. I explained to Mr. Carmack that a psychiatric report, including the results of psychological testing, would be forwarded to you. Mr. Carmack informed me last week that he had decided, after much deliberation, not to present for the psychiatric evaluation. Should any further questions arise, please do not hesitate to call.

Sincerely,

Russell G. Vasile M.D.

**RECEIVED**

SEP  4 2001

AMTRAK MEDICAL RECORDS
PHILADELPHIA, PA 19104

Exhibit __O__

# NATIONAL MEDIATION BOARD

## SPECIAL BOARD OF ADJUSTMENT NO. 928

| | |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS | ) |
| | ) Case No. 382 |
| and | ) |
| | ) Award No. 382 |
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) | ) |

Martin H. Malin, Chairman & Neutral Member
M. B. Kenny., Employee Member
L. C. Hriczak, Carrier Member

Hearing Date: September 23, 2002

### STATEMENT OF CLAIM:

Claim of Amtrak Passenger Engineer J. T. Carmack for the rescinding of the discipline imposed of "Dismissal in all capacities effective immediately" as stated in the decision letter of May 13, 2002 under the signature of Assistant General Manager-Commuter Operations Francis J. O'Connor, Jr., and restoration to service with full seniority and vacation rights unimpaired, with full compensation for time lost, full credit toward vacation entitlement, health and welfare benefits during the period held out of work, and clearing Claimant's personal records of any reference to the alleged violation.

### FINDINGS:

Special Board of Adjustment No. 928, upon the whole record and all the evidence, finds and holds that Employee and Carrier are employee and carrier within the meaning of the Railway Labor Act, as amended; and, that the Board has jurisdiction over the dispute herein; and, that the parties to the dispute were given due notice of the hearing thereon and did participate therein.

On September 10, 2001, Claimant was directed to report for an investigation on September 17, 2001. The notice charged Claimant with violating Amtrak's Standards of Excellence, Professional and Personal Conduct, by failing to comply with the direction of the Director of Operations to appear for and cooperate with a fitness for duty evaluation on August 27, 2001.

The hearing was postponed to and begun on April 4, 2002. The hearing continued on April 23 and 24, 2002, and was completed on May 7, 2002. On May 13, 2002, Carrier advised Claimant that he had been found guilty of the charges and dismissed from service.

The record reflects that on April 11, 2001, the Division Road Foreman found a packet of

40 - 50 pages on his desk that was entitled, "Letters from Hell." Claimant was the apparent author of most of the material in the packet, including a parody of Shakespeare's Hamlet, in which the Road Foreman was cast as Rozencrantz and the Local Chairman was cast as Guildenstern, two characters who were killed. The packet also included a letter addressed, "Dear God," which stated, "I hear a fat lady singing," and was closed by "Lucifer, Prince of Darkness." The packet also contained correspondence and related material concerning a dispute Claimant had with Carrier concerning a prior disciplinary action taken against him and material critical of the Local Chairman. The Road Foreman interpreted the packet as a threat against him and reported the matter to the Threat Assessment and Response Team (TART).

The Director of Labor Relations, in his capacity as a member of the TART, determined that the documents should be reviewed by Carrier's Medical Department. He forwarded a small portion of the packet, approximately five pages, consisting of the pages that the Road Foreman had found threatening, to the Medical Department. Carrier's Medical Officer for the Northeast Corridor reviewed the documents and determined that Claimant should be medically disqualified pending a fitness for duty examination.

By letter dated May 4, 2001, the Director of Operations notified Claimant that he had been medically disqualified pending a fitness for duty exam and that he was being withheld from service with pay. By letter dated May 17, 2001, the Director of Operations instructed Claimant to appear for a fitness for duty exam with a Boston doctor on June 4, 2001. The doctor appears, from the record, to be board certified in psychiatry and neurology.

Claimant canceled the June 4, 2001, appointment and refused to reschedule it. By letter dated June 8, 2001, the Director of Operations notified Claimant that, in light of his actions, his status was changed to medically disqualified without pay, and ordered him to contact the Medical Department by June 15, 2001, to reschedule the fitness for duty exam. The letter warned Claimant that his failure to do so would subject him to "charges of insubordination, which, if proved, could result in your permanent dismissal from service."

On June 27, 2001, Claimant appeared at the doctor's office with the Local Chairman. Claimant refused to submit to a psychiatric examination. The doctor notified Carrier's Medical Officer by letter dated July 16, 2001. By letter dated July 24, 2001, the Director of Operations advised Claimant that he was making "one last effort to resolve this matter," and directed Claimant to schedule another appointment with the doctor. The letter further warned Claimant, "If you either fail to appear, refuse to cooperate with the physician, or adopt some other tactic to frustrate this evaluation, I will then place your behavior within the formal process. Such behavior will lead me to issue charges for gross insubordination and possibly other contrary activities."

Claimant and the doctor agreed to an appointment for August 27, 2001. However, by letter dated August 28, 2001, received by Carrier's Medical Department on September 4, 2001, and conveyed to the Director of Operations on September 5, 2001, the doctor advised that Claimant refused to present for the evaluation. Claimant apparently refused to participate in the

evaluation because Claimant objected to the doctor sharing the results with Carrier's Medical Officer on the ground that such action would breach physician-patient confidentiality.

There is no question that Claimant did not comply with the Director of Operation's order of July 24, 2001. Although Claimant testified that he complied by scheduling another appointment with the doctor, it is clear that the order went beyond literally scheduling another appointment and also required Claimant to appear, cooperate with the doctor and not frustrate the evaluation. Claimant clearly did not cooperate and did frustrate the evaluation.

The Organization's position is two fold. First, the Organization contends that the charges were not timely. Second, the Organization maintains that Claimant was not obligated to comply with the order.

Rule 21.d.1 of the Agreement provides, in relevant part:

A Passenger Engineer directed to attend a formal investigation to determine his responsibility, if any, in connection with an act or occurrence will be notified in writing within seven days from the date of the act or occurrence or in cases involving stealing or criminal offense within seven days from the date the Carrier becomes aware of such act or occurrence.

We agree with the Organization that Rule 21.d.1 clearly distinguishes between stealing and criminal offenses on the one hand and all other disciplinary acts or occurrences on the other. It is only in cases of the former that the time limit for providing notice of the charges runs from the date of Carrier's knowledge. Insubordination is not stealing and it is not criminal. Therefore, the time limit starts to run with the act of occurrence, not with Carrier's knowledge of it.

However, we do not agree with the Organization's argument that the charge in the instant case was untimely. The critical question is when was the act or occurrence completed. The Organization maintains that the act or occurrence was complete on August 27, 2001, when Claimant refused to submit to the fitness for duty examination. We do not agree.

Insubordination is a very serious offense that usually results in dismissal. The essence of the offense is not only the failure to comply with an instruction but also the belligerent affront to supervisory authority. Indeed, it is the affront to supervisory authority, the "in your face" character of the offense, that is the source of its seriousness and the justification for the severity of the discipline usually imposed. The affront to authority cannot occur until the supervisor who issued the order is notified of the subordinate's refusal to comply. Had Claimant called the Director of Operations on August 27, 2001, and told the Director he would not cooperate with the examination, the time limits would have run from that date. However, the affront to the Director's authority did not occur until the Director was notified that Claimant had not cooperated with the examination; thus the offense was not complete until September 5, 2001. Accordingly, we conclude that the charge was timely.

–3–

Much of the Organization's contention that Claimant's refusal to comply with the order was not insubordinate consisted of an attack on the order itself. The Organization argued that the Road Foreman overreacted to a humorous parody and noted that the Local Chairman did not consider the parody threatening. The Organization complained that the Medical Director decided to disqualify Claimant and have him examined based on only five pages of a much longer packet that were taken out of context. The Organization further contended that after the Medical Officer disqualified Claimant, Claimant's personal physician wrote that Claimant was qualified for service, thus triggering Rule 25's procedure for a mutually selected third doctor to examine Claimant, rather than a referral to a doctor unilaterally selected by Carrier's Medical Office.

None of these arguments provide a defense to the charge of insubordination. The general rule in labor relations is that an employee, confronted with a directive that he believes violates the Agreement or is otherwise improper, must obey now and grieve later. Claimant deliberately failed to do so.

There is an exception to this general rule which is recognized in Carrier's Standards of Excellence as "when compliance with a particular instruction would cause a clear, immediate danger to you, your fellow employees, our customers, the public or company property." The Organization introduced several letters from Claimant's doctor that stated that submission to the fitness for duty exam would have been medically harmful to Claimant. Claimant's doctor did not testify and the record contains no evidence of the basis for her opinion. The Hearing Officer discounted the probative value of the letters and we find that she acted properly in doing so.

Accordingly, we conclude that Carrier proved the charge by substantial evidence. The claim must be denied.

### AWARD

Claim denied.

_____
Martin H. Malin, Chairman


_____
L. C. Hriczak,
Carrier Member

_____
M. B. Kenny,          4-21-03
Employee Member

Dated at Chicago, Illinois, January 31, 2003.

-4-

Exhibit  P

contains a broad range of behaviors that it encourages employees to report. I find it reasonable that Mr. DeModena would choose to do so.

The fact that the TART team submitted only the portion of the materials found on Mr. DeModena's desk that concerned him does not prove the incident to be manufactured either. Dr. Pinsky was clear that he found all the materials disturbing and maintains that he believes a fitness for duty examination is necessary in your case.

Although the May 11, 2001 email indicates that Mr. DePhillips suggested a course of action that included a fitness for duty examination and included a consideration of what would happen if you refused to undergo the exam, there was no other evidence provided that would indicate that the evidence was manufactured. In fact, the email was sent to Dr. Pinsky and he chose a course of action slightly different from the one promoted by Mr. DePhillips.

The determination that a fitness for duty examination was the proper course of action, rather than use of the EAP or some other form of counseling, appears to be within the purview of options contemplated under PERS-42. The policy clearly states that it contains guidelines and not a road map of steps that need to be followed. Moreover, the policy specifically spells out a role for the Carrier's Medical Director. Under the policy the Medical Director "provides guidance on fitness for duty evaluations and analyzes documentation for medical related issues" and "reviews and coordinates medical information from outside medical resources." Thus, the role played by Dr. Pinsky is fully consistent with the dictates of PERS-42.

I also find no merit to the Organization's claim that Rule 25 contained within the BLE Agreement was violated. Rule 25 provides:

> b.    When it is obvious that a Passenger Engineer is medically (physically or mentally) impaired in a way that affects his service, the Corporation may hold that Passenger Engineer out of service pending the outcome of a medical examination. Passenger Engineers held out of service by the Corporation because they are medically unable to perform service may have an examination by a doctor of their own choosing without expense to the Corporation. In case of disagreement on the . . . the two doctors will select a third doctor, who is a specialist in the medical area involved, and the decision of the majority of the three as to the Passenger Engineer's fitness will be final. . . .

Rule 25 provides for the employee to have an exam by a physician of their own choosing only after the Carrier's physician determines that they are medically unable to perform their job. Since Dr. Vasili did not examine you, no such finding was ever made. Rather, you were being held out of service pending a determination. Therefore, it was premature to seek your physician.

Exhibit ___ Q

NATIONAL RAILROAD PASSENGER CORPORATION





Date    March 3, 2002

To    M.J. O'Bryan

From    W.C. Rae

Department    Carmack File 01-049

Subject    Dr. Vasile

cc

Hand Deliver

Message    I was able to meet with Dr. Vasile this morning to once again request that he appear at the Carmack Investigation on Thursday April 4, 2002 in Boston. He declined. I asked if he would be willing to testify by telephone, at his convenience. He declined. I then offered to postpone his testimony to a later date, if scheduling was a problem. He declined. He has no contractual obligation to Amtrak, does not want to testify at a hearing, and has requested that Amtrak use another Physician if or when Mr. Carmack is evaluated in the future.
As Dr. Vasile has no direct knowledge of the Insubordination charge or Amtrak procedures, I had not intended to have him testify on behalf of the Carrier, at this Investigation.

Exhibit __R__

NATIONAL RAILROAD PASSENGER CORPORATION

30th Street Station, Philadelphia, PA 19104



December 12, 2001

Mr. Mark B. Kenny, General Chairman
Brotherhood of Locomotive Engineers
Cherry Tree Corporate Center - Suite 125
535 Route 38
Cherry Hill, NJ 08002

Dear Mr. Kenny:

This confirms our conversations regarding the posting of the Brotherhood of Locomotive
Engineer 2001 Seniority Roster.  Due the extraordinary delay in posting, it is agreed to post the
2001 Seniority Roster on December 13, 2001, and hold the roster open for protest through April
15, 2002.  It is also agreed that the 2002 Seniority Roster will be posted on June 15, 2002.

If you are in agreement, please sign both originals, returning one signed original to this office.

Very truly yours,

Larry C. Hriczak
Director, Labor Relations

I Agree:

_____   12, 12, 01
Mark B. Kenny, General Chairman

# Brotherhood of Locomotive Engineers

*~~~~ Committee of Adjustment*

## NATIONAL RAILROAD PASSENGER CORPORATION
Consolidated National Operations Center

*Crew Management Services*

**DATE:**     November 30, 2001

**TO:**     All BLE Employees

**FROM:**     Robert Schmitt, Asst. General Manager, CMS

**SUBJECT:**   BLE Roster 2001

The enclosed roster is the official Amtrak BLE Roster for 2001. This roster will be held open for protest through March 31, 2002.

Please send all protest via email to Schmitr@amtrak.com or fax to 302-683-2196. You can also mail it care of Bob Schmitt at:

*Robert H. Schmitt*
*Assistant General Manager*
*Crew Management Services*
*15 S. Poplar Street*
*Wilmington, DE  19801*

### Below is a key for status and prior rights.

LOA:  Leave of Absence
MLA:  Medical Leave of Absence
COB:  Company Business
INJ:  Injured
SPD:  Special Duty
AWL:  Absent Without Leave
FTD:  Failed to Displace
BLE:  Leave for BLE Union Representation

Y:  Prior Rights to Original Zone
F:  Conrail Flow Over Prior Rights NEC
YP:  Prior Rights PCS
YC:  Prior Rights CSX Cardinal Route
YF:  Prior Rights to 2nd Engineer Positions on Original Zone
YA:  Prior Rights Auto Train

cc:    M. L. Kates
       L. Hriczak
       M. Ka~~~

# AMTRAK ENGINEERS
# NATIONAL SENIORITY ROSTER 2001

| National Roster Number | NAME | Entered Service | Current Zone | Former RR | Prior Rights | Original Zone | Current Status | Status Effective Date |
|---|---|---|---|---|---|---|---|---|
| 1301 | ANDREASON, C. E. | 10/01/96 | 1 | CRRR | F | 1 | | |
| 1302 | ANDREASON, C. E. | 10/01/96 | 1 | CRRR | F | | | |
| 1303 | BACHERS, J. A. | 10/01/96 | 1 | CRRR | F | 1 | | |
| 1304 | KLINE, A. E. | 10/01/96 | 2 | CRRR | F | 2 | | |
| 1305 | WHITE, D. R. | 10/01/96 | 2 | CRRR | F | 2 | | |
| 1306 | SCOTT, S. G. | 10/01/96 | 2 | CRRR | F | 2 | | |
| 1307 | MCGRAW, G. | 10/03/96 | 4 | | | | FTD | 11/27/01 |
| 1308 | VINSON, J. S. | 10/09/96 | 9 | | | | INJ | 12/18/00 |
| 1309 | STEELE, J. S. | 10/11/96 | 9 | | | | | |
| 1310 | MACDONALD, J. R. | 10/15/96 | 3 | | | | | |
| 1311 | BRUNKHURST, A. | 10/16/96 | 12 | | | | | |
| 1312 | MALTIN, D. | 10/16/96 | 12 | | | | | |
| 1313 | SMITH, E. N. | 10/16/96 | 12 | | | | | |
| 1314 | DANIELL, D. A. | 10/16/96 | 9A | | | | | |
| 1315 | CULP, C. S. | 10/16/96 | 12 | | | | | |
| 1316 | GUZMAN, E. | 10/16/96 | 12 | | | | | |
| 1317 | ROGERS, W. E. | 10/16/96 | 12 | | | | | |
| 1318 | MORGAN, D. P. | 10/16/96 | 12A | | | | LOA | 09/30/99 |
| 1319 | RALSTON, R. | 10/16/96 | 12 | | | | | |
| 1320 | PADEN, J. | 10/16/96 | 12 | | | | | |
| 1321 | MAGALLAN, R. | 10/16/96 | 12 | | | | | |
| 1322 | BOBOWICZ, A. | 10/16/96 | 12 | | | | | |
| 1323 | KENDRA, R. | 10/21/96 | 4 | | | | MLA | 02/01/97 |
| 1324 | RESSIN, R. D. | 11/25/96 | 5 | | | | | |
| 1325 | POMRENKE, W. | 12/02/96 | 8 | | | | | |
| 1326 | JONES, T. L. | 12/06/96 | 12 | | | | | |
| 1327 | RICHE, J. C. | 12/11/96 | 12 | | | | | |
| 1328 | BUSLER, D. | 12/11/96 | 12 | | | | | |
| 1329 | KIELY, J. J. | 12/11/96 | 10 | | | | | |
| 1330 | MORGAN, S. H. | 12/11/96 | 12 | | | | | |
| 1331 | GIRGIS, N. | 12/11/96 | 12 | | | | | |
| 1332 | HALLA, J. J. | 12/11/96 | 12 | | | | | |
| 1333 | ABBOTT, R. C. | 12/20/96 | 3 | | | | | |
| 1334 | CARMACK, J. T. | 12/20/96 | CS1 | | | CS1 | MLA | 07/24/01 |
| 1335 | EIDENS, M. | 12/20/96 | 3 | | | | | |
| 1336 | ABAIRE, K. | 12/20/96 | 3 | | | | | |
| 1337 | JOSEPH, J. G. | 12/20/96 | CS1 | | | | | |
| 1338 | MARSDEN, W. J. | 12/20/96 | CS1 | | | | | |
| 1339 | PEREIRA, S. | 12/20/96 | 3 | | | | | |
| 1340 | KEPNER, M. | 12/20/96 | 3 | | | | | |
| 1341 | STORSTEEN, M. | 12/20/96 | CS1 | | | | | |
| 1342 | BARNARD, C. L. | 12/20/96 | CS1 | | | | | |
| 1343 | KENNEDY, J. | 12/20/96 | 1 | | | | | |
| 1344 | QUICK, N. M. | 01/09/97 | 6 | | | | | |
| 1345 | AKERS, C. L. | 01/13/97 | 5 | | | | | |
| 1346 | FREEMAN, L. | 01/13/97 | 11 | | | | | |
| 1347 | SMITH, J. M. | 01/20/97 | 5 | | | | | |
| 1348 | CHADWELL, M. E. | 01/20/97 | 5 | | | | | |
| 1349 | FULTZ, B. R. | 01/20/97 | 5 | | | | | |
| 1350 | HENRY, D. A. | 01/20/97 | 5 | | | | | |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only). _Joseph T. Carmack_ v, _National Mediation Board Special Board of Appeals No. 928_

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

2005 JAN 31 P 1:37

U.S. DISTRICT COURT

05 10185

- [ ] I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

- [x] II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

- [ ] III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

- [ ] IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

- [ ] V.     150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ]     NO [ ]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES [ ]     NO [ ]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ]     NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [ ]     NO [ ]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [ ]     NO [ ]

A.    If yes, in which division do all of the non-governmental parties reside?

Eastern Division [ ]     Central Division [ ]     Western Division [ ]

B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [ ]     Central Division [ ]     Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ]     NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME _____

ADDRESS _____

TELEPHONE NO. _____

(Coversheetlocal.wpd - 10/17/02)

⊗JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Joseph T. Carmack<br>Petitioner, Pro Se | National Railroad Passenger Corp<br>Special Board of Adjustment |
| (b)  County of Residence of First Listed Plaintiff  Suffolk<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
| (c)  Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |

FILED
2005 JAN 31 P 1:38
DISTRICT COURT
DISTRICT OF MASS

05 10185 PBS

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government
    Plaintiff

☒ 3  Federal Question
    (U.S. Government Not a Party)

☐ 2  U.S. Government
    Defendant

☐ 4  Diversity
    (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br> & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br> Student Loans<br> (Excl. Veterans)<br>☐ 153 Recovery of Overpayment<br> of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br> Liability<br>☐ 320 Assault, Libel &<br> Slander<br>☐ 330 Federal Employers'<br> Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br> Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br> Product Liability<br>☐ 360 Other Personal<br> Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury -<br> Med. Malpractice<br>☐ 365 Personal Injury -<br> Product Liability<br>☐ 368 Asbestos Personal<br> Injury Product<br> Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br> Property Damage<br>☐ 385 Property Damage<br> Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br> of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational<br> Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards<br> Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting<br> & Disclosure Act<br>☒ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc.<br> Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br> 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br> or Defendant)<br>☐ 871 IRS - Third Party<br> 26 USC 7609 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br> Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br> Exchange<br>☐ 875 Customer Challenge<br> 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information<br> Act<br>☐ 900Appeal of Fee Determination<br> Under Equal Access<br> to Justice<br>☐ 950 Constitutionality of<br> State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br> Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities -<br> Employment<br>☐ 446 Amer. w/Disabilities -<br> Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate<br> Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | | | |

## V. ORIGIN  (Place an "X" in One Box Only)

☐ 1  Original
    Proceeding

☐ 2  Removed from
    State Court

☐ 3  Remanded from
    Appellate Court

☐ 4  Reinstated or
    Reopened

☐ 5  Transferred from
    another district
    (specify)

☐ 6  Multidistrict
    Litigation

☐ 7  Appeal to District
    Judge from
    Magistrate
    Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
45 U.S.C. s. 153 (Q)
Brief description of cause:
Petition for Review under Section 3(First) of Railway Labor Act

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):

JUDGE  Honorable P. B. Saris

DOCKET NUMBER  03-12488-PBS

DATE  1/3/2005  Pro Se

SIGNATURE OF ATTORNEY OF RECORD  Joseph T. Carmack

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____